**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO.  3:18-CR-158-WHR** |
| | : | |
| **Plaintiff,** | : | **UNITED STATES' MOTION FOR** |
| | : | **PROTECTIVE ORDER RE:** |
| **v.** | : | **UNDERCOVER WITNESSES** |
| | : | |
| **NASER ALMADAOJI,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

1.  <u>Introduction</u>.

Five of the witnesses the United States anticipates calling to testify at trial
work in an undercover capacity.  They are:  (1) an FBI undercover employee (UCE),
(2) an FBI online covert employee (OCE), and (3) three confidential human sources
(CHSs).  All five witnesses adopted "personas," namely, that of ISIS members or
supporters, as they interacted with the defendant, Naser Almadaoji, either in
person (UCE) or online (UCE, OCE and CHSs), during the months and days leading
up to Almadaoji's arrest at the Columbus airport.  The witnesses recorded in
varying manners their dealings with Almadaoji and are prepared to testify at trial
in order to authenticate and explain to the jury their communications and
interactions with Almadaoji.  But, as explained in the concurrently filed declaration
(attached as Exh. 3) and in the classified declaration filed *ex parte*, *in camera*, and
under seal (filed separately as Exh. 4), all five witnesses continue to operate in
undercover capacities in *ongoing* national security investigations, and society would

benefit from them being able to continue their undercover work in *future* investigations. The United States accordingly seeks an order putting in place reasonable precautions -- consistent with the Sixth Amendment -- in order to protect their identities. These precautions are necessary in order to protect the safety of the witnesses and their families, and to preserve their ability to continue their important but dangerous work on behalf of the nation.

2. Background.

Almadaoji is charged in a Superseding Indictment with two counts of attempting to provide material support to a designated terrorist organization, namely, ISIS (both counts) and ISIS Wilayat Khorasan (count one), in violation of 18 U.S.C. § 2339B(a)(1). (ECF No. 29, Indictment at PageID 134-135.) The charges relate to Almadaoji's attempt to travel overseas to join up with and fight for ISIS and ISIL Khorasan (count one), and his attempt to provide translations services to ISIS (count two). (ECF No. 1, Complaint at PageID 3-25.)

As outlined in the Complaint, the investigation in this case commenced upon Almadaoji's return from a trip to the Middle East in February 2018. (ECF No. 1, Complaint at PageID 4.) CBP Officers at O'Hare airport grew suspicious after observing some of Almadaoji's belongings and after interviewing him. (*Id.* at 5.) The CBP Officers' suspicions were well-founded, as Almadaoji was, as he would later confirm to one of the undercover witnesses, in fact returning from a failed attempt to join ISIS groups in Egypt and Syria. (*Id.* at 5, 10-12.)

2

Because Almadaoji resided in Beavercreek, Ohio, FBI agents in Dayton took lead in the investigation. After learning that Almadaoji used an encrypted group and private messaging and voice communications application, to operate under the user name @AbuMuhammad19, the FBI CHSs, OCE, and UCE began communicating with Almadaoji using the application.

One CHS acting in an undercover capacity on a pro-ISIS group chat reported that @AbuMuhammad19 was also a member of the group and had in July and August 2018 posted graphic ISIS videos, made pro-ISIS postings, and discussed the execution of "spies."

Another CHS operated three different online "personas" who would, from August to October 2018, have extensive communications with Almadaoji via the application , as detailed in the Complaint. (ECF No. 1, Complaint at PageID 5-24.) Almadaoji translated a genuine ISIS document into English for one of the personas. After Almadaoji provided to another persona a "bayyah" video -- a solemn recorded pledge of allegiance to ISIS -- this CHS had that "persona" connect Almadaoji to an FBI undercover employee (UCE) who was posing as an ISIS supporter in the Midwest. (ECF No. 1, Complaint at PageID 13.) As detailed in the Complaint, Almadaoji's face-to-face and electronic interactions with the UCE were followed by Almadaoji's purchase of airline tickets in order to travel overseas to join ISIS and ISIS Khorasan, the two driving to the Columbus airport, and, ultimately, Almadaoji's arrest at the airport. (*Id*. at 13-25.)

3

A third CHS who operated an online persona as an ISIS member communicated with Almadaoji regarding an Egyptian associate of Almadaoji. During these communications, Almadaoji and the CHS discussed helping the Egyptian associate join ISIS or its affiliates. During the course of the investigation, Almadaoji also communicated with an FBI OCE regarding, among other things, ISIS news sites and evading detection from thermal imaging at border crossings.

Almadaoji is scheduled for trial beginning April 27, 2020. At trial the United States anticipates calling the UCE, OCE, and the three CHSs to testify as to their respective communications and interactions with Almadaoji. All five of these witnesses continue to work in an undercover capacity on other matters unrelated to this case, and desire to do so in future matters. Their ability to continue to work in an undercover capacity, and potentially their physical safety as well, would be jeopardized by the public disclosure of their true identity or physical appearance.

3. <u>Protective Measures Sought</u>.

Based upon the need to protect from disclosure these witnesses' true identity and physical characteristics, and the need to protect other undercover investigations and the government's undercover investigative procedures, the United States respectfully submits that there are certain measures the Court may and should adopt for the testimony of these witnesses at trial. As set forth more fully below, the proposed security measures are narrowly tailored to assure that the identity and security of the witnesses, and the integrity of other undercover investigations, will not be compromised by their appearance as witnesses at trial,

while at the same time protecting the defendant's fair trial rights under the Sixth

Amendment.  Specifically, the United States requests the Court implement the

following measures *as to all five witnesses*:

1. The witnesses may testify under a pseudonym when testifying at trial, without disclosing publically their true identity;

2. The defense shall be prohibited from asking any questions seeking personal identifying information from the witnesses;

3. The witnesses may testify using a light disguise, such as changing their facial hair, hairstyle, or dress style;

4. No public disclosure of any audio or video recording, sketch, or similar reproduction of the voice or visual image of the witnesses while testifying, shall be permitted;

5. All non-official recording devices shall be prohibited from being in the courtroom in which the witnesses testify as well as the room in which the audio feed is broadcast during the testimony;

6. The witnesses shall be permitted to use a non-public entrance/exit to the courthouse and the courtroom, shall be permitted to enter/exit the courtroom and sit in the witness chair outside the presence of the jury and defendant, and shall be permitted to remain seated when sworn in and testifying.

And as to the *UCE only*:

7. When the UCE testifies, only the Court, essential personnel as determined by the Court, the jury, the defendant and his counsel (including any paralegal or other support personnel), and the government's trial team (including the case agent and any paralegal or support personnel) shall be present in the courtroom.  The government shall provide a contemporaneous audio broadcast of the courtroom proceeding while the witnesses are testifying for the public in a separate room. [1]

---

[1] The United States is aware of 28 C.F.R. § 50.9, which requires Deputy Attorney General (DAG) authorization for government requests for court closures, even partial ones, except that the regulation does not apply to "[t]he closure of part of a judicial proceeding where necessary to protect national security information or classified documents."  Justice Manual § 9-5.150, which addresses the same subject, arguably contains no similar exception.  Rather than seek to reconcile the two, and out of an abundance of caution, the United States has sought DAG approval for this

4.  Argument.

    A.    *Use of Pseudonym (All Five Witnesses).*

The proposed use of a pseudonyms by the witnesses complies with the Confrontation Clause in this case.  Though, in *Smith v. Illinois*, 390 U.S. 129, 130-133 (1968), the Supreme Court found that preventing the defense from learning the real name of a government informant, the principal prosecution witness, on cross-examination violated the defendant's Sixth Amendment right to confrontation, *Smith* did not set out a definitive rule that the Sixth Amendment requires that the real names of government witnesses *always* be disclosed.  As the First Circuit has explained,

> Against this backdrop, it is readily apparent that all pseudonyms are not equal in the eyes of the Confrontation Clause.  Rather, courts must gauge the pull of *Smith* in any given case by the degree to which its rationale applies.  Sometimes, as in Smith itself, a witness's use of a fictitious name will transform him into a wraith and thereby thwart the efficacy of cross-examination.  Other times, the use of a fictitious name will be no more than a mere curiosity, possessing no constitutional significance.

*Siegfriedt v. Fair*, 982 F.2d 14, 18 (1st Cir. 1992).  Instead of a fixed rule, there should be a "balancing of interests in the relevant case-specific context." *United States v. Cellis*, 608 F.3d 818, 833 (D.C. Cir. 2010); *see also United States v. El-Mezain*, 664 F.3d 467, 491 (5th Cir. 2011).

Here, that balancing of interests favors permitting the witnesses to testify using a pseudonym.  The defendant in this case never knew the true names of any of the witnesses.  Except for the UCE for which, as discussed below, additional

---

aspect of this motion and will update the Court as to the DAG's determination. This aspect of this motion is made contingent upon receiving DAG approval.

6

protections are appropriate, the defendant never actually met any of the witnesses. And, again with the exception of the UCE, all of the communications between the witnesses and the defendant were conducted using social media applications in which the witnesses used online user names, not real names.  The true name of the witnesses are irrelevant to the expected testimony, and the true names would be meaningless to the defendant.  The United States will, of course, provide defense counsel with any known *Giglio*/impeachment information and Jencks Act statements for the witnesses.  Cross-examination is thus not hindered through use of a pseudonym in this case.

Several courts have approved testimony by a witness using a pseudonym, finding that the government's interest in protecting the witness from harm outweighs any interest the defendant may have in learning the true name of the witness.  *See Brown v. Kuhlman*, 142 F.3d 529, 532 n.3 (noting that undercover detective who testified in closed courtroom due to safety concerns was permitted to testify using his badge number instead of his true name); *Siegfriedt v. Fair*, 982 F.2d 14, 18 (1st Cir. 1992); *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969) (finding that "where there is a threat to the life of the witness the right of the defendant to have the witness' true name, address and place of employment is not absolute."); *United States v. Rangel*, 534 F.2d 147 (9th Cir. 1976) (holding that where record showed that witness' life had been threatened and witness and family relocated, no error in permitting witness to testify without divulging true name, address and phone number); *United States v. Ellis*, 468 F2d 638 (9th Cir. 1972)

7

(affirming decisions to prohibit cross-examination on undercover agent's name and address where there were "substantial reasons" for withholding the information and the witness' testimony was of marginal significance). Use of a pseudonym by these five witnesses in this case should be permitted.

      B.      *Prohibition Against Eliciting PII (All Five Witnesses).*

In similar vein, the government seeks a protective order limiting the ability of the defense to reveal *personally identifying information* during cross-examination.  The right to cross-examine witnesses does not require questioning on all topics without limit. "The rule is that once cross-examination reveals sufficient information to appraise the witness's veracity, confrontation demands are satisfied." *United States v. Falsia*, 724 F.2d 1339, 1343 (9th Cir. 1983). There is no absolute right of an accused to have a jury hear a witness's true name and address.  *United States v. Cosby*, 500 F2d 405, 407 (9th Cir. 1974); *United States v. Rangel*, 534 F2d 147 (9th Cir. 1976); Palermo, 410 F.2d at 472.  This restriction of cross examination for the witness's protection was recognized in the Supreme Court in *Delaware v. Van Arsdall*, noting that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Deleware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Here, inquiry into personally identifying information of the witnesses is not necessary to vindicate the defendant's right to confrontation.  Such information is

not relevant to the testimony of the witnesses and will not affect their credibility.

Such an inquiry would be of little or no value in circumstances such as these, where

the witnesses' interactions with the defendant were primarily through social media,

and when not, recorded. Further, the government will provide all required

*Giglio*/impeachment information about the witnesses, allowing any cross-

examination into those topics by defense counsel.

C.      *Light Disguise (All Five Witnesses).*

Use of a light disguise also will not affect the defendant's right to

confrontation and cross-examination. As noted above, the defendant never met four

out of the five witnesses at issue. And, as to all five witnesses, their physical

appearance was never an issue. It was the *substance* of their communications and

interactions that was important. There is also no issue of physical identification of

the witnesses for the jury to consider. Even as to the UCE, because of the time

lapse, the defendant will likely never know that the UCE has altered the UCE's

appearance. Similarly, the jury will likely never know either. Should the disguise

be apparent, the Court has the option of providing an instruction to the jury,

explaining in a neutral way why the witnesses are in disguise. The light disguise

will not be so extensive that the jury is unable to evaluate the demeanor of the

witnesses while testifying.

"[C]ourts should consider whether the disguise furthers an important state

interest and whether the reliability of the evidence could be otherwise assured."

*United States v. de Jesus-Castaneda*, 705 F.3d 1117, 1120 (9th Cir. 2013). Here the

9

important state interest is the security and continued effectiveness of the witnesses, and their physical appearance has no impact on the reliability of the evidence, and the witnesses will all still be subject to the four elements of confrontation identified in *Maryland v. Craig*—"physical presence, oath, cross-examination, and observation of demeanor by the trier of fact." *Maryland v. Craig*, 497 U.S. at 846.

D. *Other Measures (All Five Witnesses).*

The other measures requested by the government—that the witnesses be permitted to enter the courtroom by a separate entrance outside the presence of the jury, spectators, or the defendant; that the witnesses be permitted to be sworn in while sitting; that there be no audio or video recording beyond any official recording device; and that all other recording devices be prohibited—are all reasonable, necessary measures, some of which are already employed by the Court, that do not conflict with the defendant's right to confrontation.

E. *Separate Audio Feed (UCE Only).*

With respect to the UCE, because the defendant met him in person, and because the UCE's work often entails face-to-face meetings with individuals under investigation, extra precautions are in order. The government is not seeking to close the proceedings entirely but is seeking a series of reasonable measures to prevent the public disclosure of the true identity and physical description of the witness. Based upon the standards set forth below, putting in place these reasonable alternative measures, as compared to closing the proceedings entirely, is supported by the law and is an appropriate balance of the defendant's rights to a

10

public trial and confrontation, and the interests of the FBI in not jeopardizing the witness' continuing undercover work or safety. Analysis of the impact of these measures on the defendant's rights to a public trial and to confrontation follows.

      1. *Right to a Public Trial.*

The Sixth Amendment guarantees the right to a public trial. *See* U.S. Const. Amend. VI. The right to a public trial assures the defendant receives a fair trial, promotes the integrity of the fact-finding process, preserves public confidence in the criminal justice system, and affords the community an outlet to address crime. *See Waller v. Georgia*, 467 U.S. 39, 46 (1984). However, the Supreme Court has recognized the right to a public trial is not absolute and under certain circumstances, trial courts may implement reasonable trial procedures to protect other compelling interests, without violating the Sixth Amendment. *Id*. at 45. In *Waller*, the Supreme Court discussed four factors for a court to determine if closing proceedings are justified:

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Waller*, 467 U.S. at 48. The Sixth Circuit has joined other courts and adopted a modified *Waller* test to use when evaluating partial courtroom closures (when some but not all spectators are barred from the proceedings), the only modification being that "overriding interest" is replaced by requiring a showing of a "substantial reason." *United States v. Simmons*, 797 F.3d 409, 414 (6th Cir. 2015). Here instead

of seeking a "full" closure of the proceedings that bars spectators from live proceedings, the government seeks approval of measures to protect the UCE's identity, while providing spectators an alternative means of attending the trial. Although the government is not seeking to close the proceedings entirely, the modified *Waller* analysis is instructive and should guide the Court's decision.

a. <u>Substantial Reason</u>.

The government's interest at stake in this case is in protecting the safety and effectiveness of the UCE. As the Second Circuit has recognized, "The state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest, and . . . this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom. *Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir. 1997); *see also Rodriguez v. Miller*, 537 F.3d 102, 110 (2d Cir. 2008) ("It is clear that the State has an 'overriding interest' in protecting the identity of its undercover officers."). In *Ayala*, the Second Circuit further explained:

> The state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest, and the trial judge in each case was amply justified in concluding that this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom. There is no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity. Of course, the defendant himself has an opportunity to observe the officer (a second opportunity, if the defendant is guilty), and might communicate a description of the officer to others, particularly if the defendant is at liberty pending trial. The defendant's right of presence at his trial requires accepting that risk, but the right to a public trial does not require the further risk that the officer's identity will become known through observation by members of the public who might enter the courtroom and see the officer testifying.

*Ayala*, 131 F.3d at 72.

12

Ensuring the continuing effectiveness of the UCE (along with the OCE and CHSs) is of particular concern and importance here. As explained in greater detail in the concurrently filed declaration and in the declaration filed ex parte, the UCE, and indeed all of these witnesses -- continue to operate in undercover capacities in ongoing national security investigations. Losing the ability to have the UCE and other witnesses engage in this sphere would be a disservice to society. Similarly, protecting the safety of witnesses generally is also considered to be a substantial reason in this context. *See Simmons*, 797 F.3d at 414 ("In particular, courts have consistently held that ensuring witness safety and preventing intimidation constitutes a substantial reason to justify the partial closure of the courtroom.").

The facts of this case support finding that the government has a substantial reason for the proposed measures. The defendant is alleged to have attempted to provide material support to designated foreign terrorist organizations, specifically ISIS and ISIS Wilayat Khorasan. The defendant's conduct included not only efforts to join ISIS and ISIS Wilayat Khorasan, but he also envisioned plans to commit violent attacks within the United States. In addition to this violent plan to support vicious terrorist organizations, his communications with the UCE and others online and in-person showed a focus on counter-surveillance and determining if someone was a law enforcement officer or "spy." This conduct shows the risk posed by disclosure of the UCE's identity to the defendant or others. Although there are no specific threats against the UCE, the defendant's conduct and communications make clear that there is a legitimate risk that the defendant or fellow members or

13

supporters of ISIS or its affiliates are actively seeking to identify law enforcement officers and share that information with others. Protecting the UCE in this case is a "substantial reason" for the requested measures.

b. <u>No Broader Than Necessary</u>.

The measures sought by the government are no broader than necessary. The proposed measures will provide a means by which the public may hear live testimony. Requiring non-essential personnel to listen to testimony from a separate room where they cannot physically see the UCE is the least restrictive measure that assures the safety of the UCE. More restrictive measures, such as closing the proceedings to spectators during the testimony of undercover officers, without providing a separate room where the public could hear live testimony, have been approved in other cases where the public could only access a transcript after the testimony. *See Ayala*, 131 F.3d at 72 (approving partial closure of court for testimony of undercover officer where the transcript of testimony was available to the public and press); *United States v. Hernandez*, No. S1 12 Cr. 809 (PKC), 2013Wl3936185 at *2 (S.D.N.Y., Jul. 29, 2013) (approving closure of court to public during testimony of undercover officer where government agreed to make the transcript of the testimony available at the end of the trial day). Here, the government proposal allows the public to hear live testimony, in addition to having access to the public transcript. The proposal is also limited as this particular item of requested relief only applies to the *one* witness, the UCE. *See Carson v. Fischer*, 421 F.3d 83, 90 (2nd Cir. 2005) (when evaluating whether a partial court closure

14

was no broader than necessary, noting that "it is important that the closure occurred only during a single witness testimony").

These measures are especially appropriate in this case. The UCE met with the defendant in person on three occasions in late 2018, over a year and a half ago, and those meetings were recorded.[2] The content of those recordings and of the UCE's testimony is what's important, not the UCE's physical appearance.

c. <u>Reasonable Alternatives</u>.

In evaluating the third prong, "the trial court must consider reasonable alternatives to closing the proceeding . . ." *Waller*, 467 U.S. at 48. Here, the alternatives open to the Court do not provide the same balance of the competing interests. For example, the public could remain in the courtroom while the UCE testified behind a screen or barrier. *See United States v. Lucas*, 932 F.2d 1210 (8th Cir. 1991) (use of screen at trial to shield testimony of undercover police officer from public permitted). A screen would have essentially the same effect as the government's proposed option—the spectators would be able to hear, but not see the testifying UCE. However, this option is not as practical and raises other concerns. Any screen or barrier would have to allow for the Court, the jury and the defendant to see the UCE. The jury has to be able to evaluate the UCE's credibility and part

---

[2] The UCE can be seen for short times in some of those recordings, but those brief segments have been blurred in what has been produced in discovery, and the government will be seeking by way of separate motion in limine similar relief when presenting the recordings as evidence at trial. Out of an abundance of caution, the United States is treating the current motion, though, as a "substantive" motion subject to the motion cutoff deadline, and accordingly, is filing this motion now, as opposed to nearer to trial as is the traditional practice for motions in limine.

15

of the defendant's right to confront the witnesses against him includes the right to see those witnesses. *See Carson v. Fischer*, 421 F.3d at 90 (noting that a curtain, like a disguise, "would have impaired the jury's ability to see the witness and assess his credibility"). The location of the jury box, witness chair, counsel table, and bench makes such a screen unmanageable without making significant changes to the courtroom layout. Such changes to layout could impair the ability of the Court Security Officers to do their job in the courtroom, or draw undue attention to the UCE by the jury, making the jury believe that the UCE was a "special" witness deserving of extra credibility. There is also no guarantee that a spectator might not have an unanticipated viewing angle that would allow the spectator to see the UCE.

A more extensive disguise is also not an effective balancing of the interests in this case. Although the public would be able to both see the UCE and hear the UCE's testimony, the effect of an extensive disguise could be prejudicial to the defendant, as it could hinder the ability of the jury to evaluate credibility and draw undue attention to the "unique nature" of the UCE's testimony. Further, such an extensive disguise would not fully protect the UCE's physical description from the public, as spectators might still see the physical dimensions of the UCE.

### d. Adequate Findings.

Under the foregoing principles, the proposed measures requested by the government to protect the security and safety of the UCE, and to protect the integrity of other undercover investigations, would not violate the defendant's Sixth Amendment rights. The government in this case is not seeking the drastic measure

of closing the court completely during the testimony of the UCE.  The government only seeks to protect from disclosure the true identity of the UCE.  To accomplish that goal the government has proposed reasonable procedures short of closing the proceedings entirely that will not interfere with the defendant's Sixth Amendment rights and will allow the public to hear the testimony of the UCE in real time.

A common theme throughout Almadaoji's communications with the witnesses was counter-surveillance and identification of law enforcement, or "spies." Almadaoji also advocated violence, including violent acts within this country, and, indeed, against this very Courthouse.  This pattern of behavior puts the UCE at risk should the UCE's true identity become known. Almadaoji has shown he wants to discover law enforcement, inform others about law enforcement, and advocate for the use of violence. Should Almadaoji or others learn of the UCE's true identity, it would also compromise future investigations that might involve the UCE or other undercover personnel, as Almadaoji and others could apply what they learn about the UCE to other situations in which they suspect an undercover officer is present.

While the government is not aware of any particular individual who might attend the proceedings during the UCE's testimony who would pose a threat, there is "no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity." *Ayala*, 131 F.3d at 72. The risk that anyone in the courtroom might recognize either the UCE or reveal the appearance of the UCE to others would create a personal danger to the UCE and would run the risk of jeopardizing ongoing FBI investigations, especially in light of

17

Almadaoji's role in this case. Balanced against these concerns, the contemporaneous audio broadcast of the proceedings to the public in a separate room provides the public with access to the trial proceeding, except for the ability to view the UCE's physical appearance.

2. *Right to Confront Witnesses.*

The government's proposed measures also comply with the confrontation clause. The confrontation clause of the Sixth Amendment provides the defendant in a criminal trial with the right to confront and cross-examine the government's witnesses who testify against the defendant. *See* U.S. Cont. Amend. VI; *Maryland v. Craig*, 497 U.S. 836, 846 (1990); *Smith v. Illinois*, 390 U.S. 129 (1968). The "elements of confrontation - physical presence, oath, cross-examination, and observation of demeanor by the trier of fact - serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Maryland v. Craig*, 497 U.S. at 846. Here, the use of a separate room for spectators to hear testimony complies with the confrontation clause because the defendant will remain in the courtroom to both hear and see the UCE's testimony against him and will have an unobstructed view.

As noted above, courts have approved the full closure of courts for testimony of undercover agents and have approved use of screens which prevent the public from viewing the testifying witness. The government's request is consistent with these cases. A similar request to the government's request here was approved in a

18

terrorism trial in the District of Oregon. In *United States v. Mohamud*, the district

court granted a protective order that requested use of a separate room for CCTV

broadcast of undercover agents' testimony in a manner that prevented the public

from viewing the witness. That case similarly included video and photographs of the

undercover agents. *United States v. Mohamud*, No. 3:10-CR-00475-KI, ECF No.

341, Protective Order (D.Or., Dec. 19, 2012) (attached hereto as Exh. 1).

A partial closure request nearly identical to the government's request here

was also approved in a terrorism trial in the Northern District of Ohio. In *United*

*States v. Hendricks,* the district court granted a protective order authorizing

virtually the identical court-room closure procedures as sought here. The order

provided that "[w]hen the UCE testifies, only the Court, essential personnel, the

jury, the defendant and his counsel, and the government's trial team shall be

present in the courtroom," and that "[t]he government shall provide a

contemporaneous audio broadcast of the courtroom proceeding while the UCE is

testifying for the public in a separate room." *United States v. Hendricks*, No. 1:16-

265-JRA, ECF No. 84, Order at 581 (attached hereto as Exh. 2). The request here

mirrors the language in *Hendricks*, only adding language to make clear that the

both parties may have paralegal or support personnel present. The Sixth Circuit

Court of Appeals recently upheld the partial court closure, observing that the court

"clearly articulated the necessity and rationale supporting its limited closure of the

courtroom" and finding no abuse of discretion.  *United States v. Hendricks*, No. 19-3232, 2020 U.S.App.LEXIS 5066, *15-*19 (6th Cir. February 19, 2020).[3]

5.  Conclusion.

For the foregoing reasons, the United States respectfully requests that the Court grant this motion and adopt the proposed protective measures.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney

s/Vipal J. Patel
DOMINICK S. GERACE (OH 0082823)
Assistant United States Attorney
VIPAL J. PATEL (CA 156212)
First Assistant United States Attorney
200 West Second Street, Suite 600
Dayton, Ohio 45402
Office: (937) 225-2910; Fax: (937) 225-2564
dominick.s.gerace@usdoj.gov
vipal.patel@usdoj.gov

s/Justin Sher
JUSTIN SHER (DC 974235)
Trial Attorney
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20004
Office: (202) 353-3909
justin.sher@usdoj.gov

---

[3]     Hendricks did not appeal the other aspects of the protective order, including that the UCE could testify "using an 'undercover pseudonym,' wear a 'light disguise,' enter the courthouse using a nonpublic entrance, and seat himself on the witness stand 'outside the presence of the jury and defendant.'" *Id*. at *15. Similarly, Hendricks does not appeal the protective order insofar as it granted certain protections to a CHS as well. *See United States v. Hendricks*, No. 1:16-cr-265-JRA, ECF No. 84, Order at 581-582 (granting certain protections to "CHS-4").

20

## CERTIFICATE OF SERVICE

I hereby certify that this pleading was filed with this Court on this 28th day of February 2020, a process that automatically provides an electronic copy to all counsel of record.

s/Dominick S. Gerace
DOMINICK S. GERACE (OH 0082823)
Assistant United States Attorney