IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA          :          3:18-cr-158

v.                                :

NASER ALMADAOJI,                  :

Defendant                         :

**DECLARATION OF JILL SANBORN
ASSISTANT DIRECTOR, COUNTERTERRORISM DIVISION,
FEDERAL BUREAU OF INVESTIGATION**

I, Jill Sanborn, hereby declare the following:

1.      I am the Assistant Director of the Counterterrorism Division, Federal Bureau of Investigation ("FBI"), United States Department of Justice.  I am responsible for, among other things, directing the conduct of FBI counterterrorism investigations.  As the Assistant Director, I have official supervision and control over the files and records of the Counterterrorism Division, FBI, Washington, D.C.

2.      As the Assistant Director of the FBI's Counterterrorism Division, I have been delegated as an original classification authority by the Director of the FBI. *See* Executive Order 13526, Section 1.3(c). As a result, I am responsible for the protection of classified information within the Counterterrorism Division, including the sources and methods used by the FBI in the collection of information in national security investigations. To that end, I have been authorized by the Director of the FBI to execute declarations and other affidavits to protect such information.

1

3. The matters stated herein are based upon my personal knowledge, my review and consideration of documents and information available to me in my official capacity and information furnished by Special Agents or other employees of the FBI. My conclusions have been reached in accordance therewith.

4. This declaration is submitted in support of the Government's Motion for a Protective Order Pertaining to the Testimony of Undercover and Online Covert Employees and Confidential Human Sources ("Motion") in this matter. Specifically, the Government's Motion seeks a Protective Order to exclude from public disclosure certain information that would identify the FBI Undercover Employee ("UCE"), Online Covert Employee ("OCE"), and Confidential Human Sources ("CHSs") (hereinafter, collectively "the FBI assets") utilized in this case (*e.g.*, name, contact information, and/or physical characteristics). In addition, the Government's Motion requests the court to put measures in place while the FBI assets testify in order to prevent the disclosure of the assets' true identities and limit the display of each person's physical appearance. I understand that the Government seeks narrowly tailored security measures in order to: (1) ensure that the FBI assets may be used in future FBI investigations, including ongoing and future national security cases; and (2) protect the safety of the FBI assets and their families from potential threats or attacks by individuals sympathetic to terrorist organizations. I understand the Government also seeks to protect the FBI's investigative techniques, including details about the FBI's use of UCEs, OCEs and CHSs, as well as its Undercover and CHS Programs, from disclosure.

5. Specifically, I understand that the Government seeks to: (1) prohibit cross-examination designed to elicit at trial any identifying information about the FBI assets, to include name, address, DOB, or any other personal information; (2) prohibit cross-

examination designed to identify certain online monikers or personas; (3) prohibit cross-examination designed to elicit at trial any information about the FBI assets' participation in other past and pending investigations or undercover operations; (4) prohibit cross-examination designed to elicit at trial any information about the FBI's Undercover Programs; (5) allow the FBI assets to testify in a manner that prevents their facial appearance from being revealed to the public, and allow their appearance to be obscured in any video or photographic evidence introduced during trial; (6) permit the FBI assets to testify in light disguise; (7) allow the FBI assets to enter the courtroom from a non-public entryway; and (8) prohibit any recordings of the FBI assets' voices apart from the official court record.

## I. THE FBI's UNDERCOVER PROGRAMS

6.      The use of the undercover technique is an important tool in the detection, prevention and prosecution of numerous investigations that are central to the FBI's national security and law enforcement missions. The services rendered by FBI UCEs and OCEs provide important information that the United States Government relies upon to serve these missions, often at great danger to the personal safety of the UCEs, OCEs and their families.

7.      The successful use of the undercover technique in FBI investigations is dependent upon a small group of personnel who are trained and certified as UCEs and OCEs. The FBI expends substantial financial resources, time and effort to select, train and protect its UCEs and OCEs. The FBI's Undercover Programs and certification processes are rigorous and multi-tiered, because the FBI must select only those individuals who can perform safely and effectively in an undercover capacity. Additionally, due to the sensitivities surrounding national security cases in particular, details about the identity of

and specific training received by UCEs and OCEs who work these cases are considered classified and cannot be publically disclosed.

8.    The FBI devotes substantial resources to identify, train and support its undercover operations throughout the country. UCEs and OCEs are highly valuable, non-fungible assets, and the FBI goes to great lengths to effectively train them and protect their true identities. The FBI's Undercover Programs would be severely diminished if it were required to reveal how it prepares its UCEs and OCEs for operational deployment or which employees have been certified to work as UCEs or OCEs. Publically disclosing how the FBI conducts undercover operations would render the investigative technique useless, jeopardizing current and future law enforcement and national security investigations. Lastly, there are significant, legitimate fears of retaliation against UCEs, OCEs and their families by investigative targets and groups associated with those persons.

9.    Thus, the FBI has a substantial interest in the integrity of its Undercover Programs, how it operates, and perhaps more importantly, in the personal safety of its UCEs, OCEs and their families. The FBI's Undercover Programs would be seriously prejudiced by requiring an UCE or OCE to testify in a manner that could reveal that person's true identity, or the nature and extent of the FBI's use of the undercover technique or its training programs.

## II. THE FBI's CHS PROGRAM

10.    The FBI has successfully vetted and recruited CHSs since its inception. CHSs often provide critical intelligence and information to that the FBI could not obtain in other ways. It is no exaggeration to say that the information obtained from the FBI's CHS Program is the lifeblood of the FBI, because it is an important tool in the detection,

4

prevention and prosecution of numerous investigations that are central to the FBI's national security and law enforcement missions. The services rendered by FBI CHSs provide important information that the United States Government relies upon to serve these missions, often at great danger to the personal safety of the CHS and to the CHS's family.

11. Similar to UCEs and OCEs, CHSs are also highly valuable, non-fungible assets, and the FBI goes to great lengths to effectively train them and protect their true identities. The FBI represents to all of its CHSs that the confidentiality of the relationship between the FBI and CHS is of primary concern. These representations are given in good faith and without time limitation. Revealing the identity of a CHS could not only potentially endanger that person and their family or friends, it could also do serious damage to the ability of the FBI to recruit and train other sources in the future. As a result, disclosure of a CHS's identifying information typically requires high-level FBI approval (*i.e.*, a field office's Special Agent in Charge, the top ranking executive in that office) and is permitted only when doing so is absolutely necessary to achieve important investigative, public policy, or safety goals. This principle extends even to discussion to disseminate the CHS's identity and relationship with the FBI within the Department of Justice and among task force members. Accordingly, FBI policy requires that such critical information be protected from disclosure except to those who need to know this information in order to carry out their official duties and except as legal required.

12. The FBI's CHS Program would also be severely diminished if it were required to reveal how it prepares its CHS for operational deployment or which persons work as CHSs. Publically disclosing how the FBI conducts investigations using CHSs would render the investigative technique useless, jeopardizing current and future law

5

enforcement and national security investigations. Lastly, there are significant, legitimate fears of retaliation against a CHS and their family by investigative targets and groups associated with those persons.

13. Thus, the FBI has a substantial interest in the integrity of its CHS program, how it operates, and perhaps more importantly, in the personal safety of its CHSs and their families. The FBI's CHS program would be seriously prejudiced by requiring a CHS to testify in a manner that could reveal the CHS's true identity, or the nature and extent of the FBI's use of CHSs or the FBI's CHS program.

### III. CONSEQUENCES OF FAILING TO PUT PROTECTIVE MEASURES IN PLACE

14. For the reasons described below, failure to put in place the requested protective measures could reasonably compromise the FBI's Undercover and CHS Programs and the FBI assets' identities, and perhaps most importantly, could put the FBI assets and their families in jeopardy of physical harm. This is especially concerning for FBI assets who work national security investigations, as their true identities and the extent to which they participate in national security matters are classified. If the identities of the FBI assets are revealed or their position as FBI assets, then any investigation in which the FBI assets are involved currently or in the future would be jeopardized. In fact, publically disclosing an FBI asset would effectively render that person unavailable to work in ongoing or future investigations. Since the FBI assets involved in this investigation have very unique abilities and skills, the consequences of their inability to participate in future FBI national security investigations cannot be underestimated. The FBI would be left without an important resource to fulfill its mission.

6

15. A terrorist organization, for example, could use an FBI asset's true identity to obtain pictures of the FBI asset either from the Internet or by using the identity to locate and photograph the FBI asset. Using the Internet, the terrorist organization could widely circulate the picture of the FBI assets to its operatives. The FBI has concerns that in such a scenario FBI assets and their families may be threatened, harmed, or killed in an effort to thwart investigations, retaliate against the FBI asset, or dissuade other persons from participating in the FBI's Undercover and CHS Programs.

16. These conclusions are not idle speculation. FBI assets have been threatened as a result of their undercover activities in counterterrorism investigations. The concern regarding an FBI asset's vulnerability to being targeted for harm and exposure is considerably heightened by the increasing availability of personal information on the Internet. Indeed, several web sites exist which encourage the posting and dissemination of the identities and personal information about law enforcement undercover agents/officers. With the simple click of a mouse, personally-identifying information about or a photograph of an FBI asset – like the ones in this case– can be transmitted instantly to adversaries. The Justice Department and other law enforcement agencies have argued that the dissemination of such information on the internet not only compromises pending and future investigations, but also places undercover agents in potentially grave danger. That is certainly the case here as the vulnerability of the FBI asset and the FBI asset's family to personal attack is substantially greater if the FBI asset's true identity and physical characteristics are disclosed.

17. Finally, revealing how the FBI trains and operates its FBI assets in law enforcement and national security investigations would allow targets and the groups

7

associated with them to evade detection or conduct operational security, effectively rendering the undercover technique useless and putting at risk the ability of the FBI to investigate and prevent criminal and terrorist activity.

18.    Accordingly, and consistent with my responsibilities, I am submitting this declaration to support the government's request that this Court order certain security measures to protect against the disclosure of the true identities and physical characteristics of the FBI assets, as well as, the nature or extent of the FBI's undercover technique and its Undercover and CHS Programs.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on February 28 , 2020


Jill Sanborn
Assistant Director
Counterterrorism Division
Federal Bureau of Investigation

8