**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No.  3:18-CR-158 |
| *Plaintiff,* | : | |
| v. | : | Judge Walter H. Rice |
| NASER ALMADAOJI, | : | |
| *Defendant.* | : | |

**RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE TESTIMONY ABOUT VIOLENCE BY TERRORIST ORGANIZATIONS**

## I.   INTRODUCTION

The government respectfully submits this response in opposition to Defendant Naser Almadaoji's Motion *in Limine* to Preclude Testimony About Violence by Terrorist Organizations.  Doc. 63, PageID# 440.  The motion should be denied because: (1) the government's proffered evidence involving violent acts committed by ISIS and/or ISIS Wilayat Khorasan (hereinafter "ISIS-K") is relevant to and highly probative of elements of the charged offenses—namely, that Almadaoji knew that ISIS and ISIS-K are terrorist organizations, engage in terrorist activity, or engage in terrorism, and that Almadaoji intended to provide material support or resources to those organizations; and (2) the probative value of the evidence is not substantially outweighed by a danger of unfair prejudice, confusion of the issues, or misleading the jury.  Additionally, Almadaoji's proposed stipulation is insufficient in that it offers only to stipulate to some, not all, of the issues on which the proffered evidence is probative.

**II. ARGUMENT**

**A.  The Proffered Evidence**

Defendant seeks to exclude as unduly prejudicial "[t]estimony or other evidence regarding violent acts committed by either of these groups [ISIS and ISIS-K], including but not limited to, the display of videos and pictures of atrocities, or testimony concerning such."  Doc. 63, PageID# 443.[1]  While "evidence regarding violent acts" is an extremely broad category, the government will attempt to make a good faith proffer of evidence that it may offer that "regard[s] violent acts" committed by ISIS or ISIS-K:[2]

- CHS 3 will testify, *inter alia*, concerning images and videos of violent acts by ISIS and ISIS-K that Almadaoji posted to Telegram or about which Almadaoji commented on Telegram.

- Dr. Lorenzo Vidino will testify, *inter alia*, that ISIS and ISIS-K engage in terrorist activity and engage and have engaged in terrorism, and that this is widely and commonly known.  The testimony is expected to include the types, nature, and extent of terrorist activity and terrorism both groups engage in and specific acts of terrorism perpetrated by them.

- Samsung Video 1:  A 2:00 minute ISIS propaganda video recovered from Almadaoji's phone.  The video includes depictions of explosions affecting buildings from an arial viewpoint.  Also depicted are individuals shooting firearms or utilizing explosive devices in urban environments.

- Samsung Video 2:  A 18:59 minute ISIS propaganda video recovered from Almadaoji's phone.  The video depicts various scenes at what appears to be an ISIS training camp, including individuals engaged in combat training, firearms practice, hand-to-hand combat, and mock assassinations.  The video also depicts ISIS trainees practicing urban combat maneuvers.   Finally, the video depicts various stages of an ISIS attack on a checkpoint.  The video describes deceased individuals as "dead apostates" and shows what appear to be two to four bodies covered by white sheets

---

[1] The testimony of multiple government witnesses—and many document and video exhibits— that the government anticipates it will offer at trial involve violent acts that were planned by Almadaoji himself or that Almadaoji himself discussed with the government witnesses.  Because defendant seeks to exclude evidence of violence "in which Mr. Almadaoji had no involvement," Doc. 63, PageID# 443, that evidence is not summarized here.

[2] The government will make available to the Court upon request any of the summarized exhibits.

2

and blood on the ground near the sheets.  It also depicts an attack on a separate checkpoint, including gunfire.

- Gmail Video 1:  A 12:18 minute ISIS-K propaganda video accessed by the naseralmadaoji@gmail.com account.  The video depicts images of ISIS-K fighters pledging allegiance (bay'ah) to Abu Bakr al-Baghdadi and extolls others to come to Khurasan to fight.  The video concludes with the depiction of the beginning and aftermath of the beheading of an individual, including the display of a severed head on top of a body.

- Gmail Video 2:  A 23:07 minute ISIS propaganda video accessed by the naseralmadaoji@gmail.com account.  The video is essentially a documentary of the decision-making process of a juvenile suicide attacker, primarily by way of interviews with the juvenile and his father.  The video depicts individuals shooting firearms in urban areas.  It shows the bodies of juveniles that the video implies were killed in gas attacks in Syria.  The video shows the faces of individuals who the video implies are dead ISIS fighters.  The video shows a compilation of explosions, shot from a distance, with associated captions claiming the explosions are suicide attacks.  The video concludes with the main subject juvenile entering a vehicle and driving off.  An explosion is seen in the distance, which the video claims is the result of the subject suicide attack.

- Gmail Video 3:  A 9:34 minute ISIS-K propaganda video accessed by the naseralmadaoji@gmail.com account.  The video depicts various individuals expressing allegiance to ISIS.  The video concludes with a statement from an imprisoned Afghan soldier warning the soldiers of the Afghan Army to abandon their service.  The video shows a sword being sharpened and concludes by showing the beginning and aftermath of the beheading of an individual, including the placing of a severed head on top of a body.

- Tablet Photograph G:  A still photograph recovered from a tablet belonging to Almadaoji.  The image shows two individuals lying on the ground with knives held to or near their necks.

- Tablet Photograph N:  A still photograph recovered from a tablet belonging to Almadaoji.  The image shows two individuals kneeling on the ground while another individual points a firearm at the back of their heads.

- Tablet Photograph T: A still photograph recovered from a tablet belonging to Almadaoji.  The image shows three individuals kneeling on the ground while three other individuals hold knives.  A caption in Arabic at the bottom of the photograph states "Today, we cut the throats of the soldiers of Bashar."

3

All the above proffered video exhibits also include translated captions, chanting, or speaking that expresses or endorses various violent ideations.[3]

The above list represents the government's best efforts to identify and summarize the evidence in its case that involves violent acts that were not planned by Almadaoji or discussed by Almadaoji with government witnesses.  The discovery and exhibits in this case, however, are voluminous.  As such, it is possible that there may be evidence of a similar nature offered at trial that is not explicitly detailed above.  Furthermore, Almadaoji has not identified any trial exhibits—despite having the opportunity to do so—that he specifically objects to, leaving the government to guess at the evidence about which he has concerns.  In any event, for the reasons stated below, the above-outlined evidence should be admitted.

## B.  The Government's Evidence is Relevant

All of the government's anticipated evidence is relevant and highly probative as direct evidence of the charged offenses.[4]  Federal Rules of Evidence 401 and 402 establish the broad principle that relevant evidence is admissible at trial.  "Evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable

---

[3] The government notes that—with respect to video and imagery—the evidence proffered here represents only a small sampling of videos and images that were collected from Almadaoji's electronic devices or accessed by Google accounts linked to Almadaoji and that depict violent and graphic conduct by ISIS and/or ISIS-K.  The government is not seeking to introduce every piece of video or imagery depicting violent conduct connected in some way to Almadaoji, nor is it seeking to introduce the most graphic or potentially upsetting evidence.

[4] Almadaoji's motion does not seem to challenge the idea that this evidence is relevant.  *See* Doc. 63, PageID# 441.  He summarily states, without elaboration, that "Testimony by Dr. Vidino or any other Government witness concerning violent or terroristic acts…generally is of very limited probative value." *Id*.  About the relevance of the video evidence, Almadaoji is silent.  This is because the relevance of violent acts perpetrated by ISIS or ISIS-K is facially relevant.  Defendant's real complaint is that the evidence is unfairly prejudicial: a question which can only be assessed in comparison to its probative value.  That topic is discussed further below.

4

or less probable than it would be without the evidence is relevant." *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006) (emphasis in original, internal quotation marks omitted) (quoting *Robinson v. Runyon*, 149 F.3d 507, 512 (6th Cir. 1998)).  Even if the evidence in question is "insufficient to prove the ultimate point for which it is offered, [courts] may not exclude the evidence if it has the slightest probative worth." *Id*. at 738-39 (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 475 (6th Cir. 1996)).  Federal Rule of Evidence 402 states that "[r]elevant evidence is admissible" absent a contrary requirement under federal law or rules.

Here, Almadaoji has been charged with attempting to provide material support and resources to ISIS and ISIS-K—both designated foreign terrorist organizations—in violation of 18 U.S.C. § 2339B(a)(1).  Accordingly, the government must prove beyond a reasonable doubt that:

> (1) Almadaoji intended to commit the crime of providing material support or resources to ISIS and/or ISIS-K;
>
> (2) Almadaoji intended to provide himself to ISIS and/or ISIS-K to work under their direction and control;[5]
>
> (3) Almadaoji knew ISIS and ISIS-K are designated foreign terrorist organizations, engaged in terrorist activity, or engaged in terrorism; and
>
> (4) that Almadaoji did some overt act which was a substantial step toward committing the crime.

*See United States v. Alebbini*, 979 F.3d 537, 546 (6th Cir. 2020).  Each item of the government's proffered evidence addresses elements that must be proven at trial.

---

[5] This element applies to Count 1, the "personnel" count.  Count 2 of the Superseding Indictment requires the government to prove that Almadaoji provided material support and resources in the form of services.

5

**1. The evidence is relevant because it proves that Almadaoji knew ISIS and ISIS-K are terrorist organizations, engage in terrorist activity, or engage in terrorism**

As an initial matter, every piece of proffered evidence or testimony directly addresses the question of whether ISIS and ISIS-K are organizations that have engaged in terrorist activity or have engaged in terrorism—an element of the offense that the government must prove beyond a reasonable doubt. The government acknowledges that Almadaoji has represented that he is willing to "stipulate and agree that ISIS and ISIS Wilayat Khorasan have been designated as foreign terrorist organizations." Doc. 63, PageID# 443. For reasons addressed later in this response, the proposed stipulation is insufficient. In any event, stipulations address issues of unfair prejudice, not the underlying relevance of the evidence in question.

There can be no serious dispute that video and testimonial evidence establishing that ISIS and/or ISIS-K engaged in firefights, beheadings, and suicide attacks is relevant to proving that those organizations are terrorist organizations that engage in terrorist activity and engage in terrorism. "Terrorist activity" is defined in section 212(a)(3)(B) of the Immigration and Nationality Act (codified in 8 U.S.C. § 1182) as, among other things, "assassination" and the "use of any . . . explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals." The statute goes on to define "engage in terrorist activity" as, among other things, "to commit or to incite, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity," and "to prepare or plan a terrorist activity." Section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989, defines "the term 'terrorism' [to] mean [] premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." Dr. Vidino's expected

6

testimony, as well as the other evidence outlined above, is probative of whether ISIS and ISIS-K, through their activities, meet these definitions.

Further, the proffered videos and images, as well as Almadaoji's interactions with CHS 3, support the government's allegation that Almadaoji *knew* that ISIS and ISIS-K were organizations engaged in terrorist activity or terrorism—an aspect conspicuously absent from Almadaoji's proposed stipulation. Possession or control of materials depicting terrorist organizations is "highly relevant" in a case where a defendant has been accused of providing material support to those organizations. *See United States v. Abdi*, 498 F.Supp.2d 1048, 1071-72 (S.D. Ohio 2007) ("Given that the Defendant is being accused of aiding al Qaeda, the fact that he has images on his computer regarding al Qaeda and other terrorist organizations is highly relevant."). The government's evidence represents pro-ISIS propaganda depicting, among other things, the group's murder of captives, its suicide tactics, and its political and religious motivations for engaging in such violence. As such, they are powerful, direct evidence of Almadaoji's knowledge that ISIS and ISIS-K are terrorist groups engaged in terrorist activity and terrorism.

The evidence, moreover, also demonstrates that Almadaoji possessed a less sensational and more technical knowledge of ISIS and ISIS-K. For example, the government's evidence will establish that Almadaoji sent CHS 1 a video depicting Almadaoji himself pledging allegiance (bay'ah) to Abu Bakr al-Baghdadi, the leader of ISIS. The language used by Almadaoji in his own bay'ah video is very similar to the bay'ah language contained in Gmail Video 1. This consistency demonstrates Almadaoji's knowledge of the language and specific nomenclature used by ISIS and/or ISIS-K when swearing allegiance to the organization. Further,

evidence of this nature also is relevant to proving that Almadaoji is (1) the person in the bay'ah video sent to CHS 1, and (2) the user of the naseralmadaoji@gmail.com account.

Samsung Video 2 serves a similar purpose. The video, recovered from Almadaoji's phone, depicts an ISIS training camp. The video includes captions describing the training that appears on screen. The descriptions include physical training, weapons-use training, self-defense skills, driving tactics, speedy assassination, and urban warfare, among other topics. The government's evidence will show that, in a communication with CHS 1 about what type of training Almadaoji would like to receive from ISIS and ISIS-K, Almadaoji stated that he would like to receive "weapon experts training, planning and executing, hit and run, capturing high value targets, ways to break into homes and avoid security guards." As such, the video constitutes more direct evidence concerning Almadaoji's knowledge of ISIS and ISIS-K generally, as well as evidence of specific knowledge about what sort of training Almadaoji could receive from those groups.

In sum, the government's proffered evidence involving violence committed by ISIS and ISIS-K is relevant to and highly probative of Almadaoji's knowledge that ISIS and ISIS-K engage in terrorism or terrorist activity.

2. **The evidence is relevant because it proves Almadaoji's intent to provide material support or resources to ISIS and ISIS-K**

The evidence at issue also is probative of Almadaoji's state of mind and intent. In Count One of the Superseding Indictment, the government has charged Almadaoji with intending to supply personnel—namely, himself—to ISIS and ISIS-K. A natural and necessary part of telling that story requires that the government be able to answer the question: "*to do what*?" The proffered evidence demonstrates exactly the type of "personnel" support that Almadaoji intended to provide. It demonstrates that he wanted to be a soldier for ISIS and ISIS-K and to receive the

8

training that those soldiers receive.  The evidence also demonstrates that Almadaoji was fully aware of the violent actions that he would have to undertake as a soldier for ISIS and ISIS-K. For example, Samsung Video 2 depicts ISIS military-style training and informs Almadaoji's understanding of the same.  Gmail Video 1 extolls viewers to come to Khurasan and fight—the very action that Almadaoji ultimately attempted to undertake.  Gmail Video 2 demonstrates the motivation and mindset of a young person who has decided to become an ISIS fighter and, ultimately, suicide attacker.

Accordingly, the government's proffered evidence depicts, in stark reality, what soldiers for ISIS and ISIS-K *do*.  This is the essence of the government's material support charge in Count One.  The expected testimony of Dr. Vidino, as well as the other evidence outlined above, establishes that ISIS and ISIS-K soldiers commit acts of violence, that Almadaoji was aware of those acts, and that he intended to provide himself to work under the direction and control of those organizations with full knowledge of the violence they commit.  Moreover, the duration of time over which videos were recovered from electronic devices, or in connection with internet accounts, controlled by Almadaoji (spanning between 2017 and 2018) demonstrates that Almadaoji's infatuation with ISIS and ISIS-K, and the brutal acts those organizations undertook, was not, at the time of his arrest, recently inspired.  Rather, the videos show that Almadaoji spent years absorbing ISIS and ISIS-K propaganda, thereby allowing it to shape his views and motives over an extended period of time.

Finally, even if it was not directly relevant to an element of the offense, evidence addressing the question of what type of "personnel" support Almadaoji intended to provide to ISIS and ISIS-K would still be relevant and admissible because proof of ISIS's willingness to commit acts of violence "implicate[s] the law's [against material support of terrorism] moral

9

underpinnings and a juror's obligation to sit in judgment." *Old Chief v. United States*, 519 U.S. 172, 187-88 ("Thus, the prosecution may fairly seek to place its evidence before the jurors…to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault."). The evidence shows that Almadaoji viewed, disseminated, and drew inspiration and motivation from violence. The jury should be allowed to see Almadaoji's view of what becoming an ISIS and ISIS-K fighter meant and to understand the moral—as well as legal—weight of his decision to support and attempt to join those organizations.

For the foregoing reasons, the government's proffered evidence is also relevant to and highly probative of Almadaoji's intent to provide material support to ISIS and ISIS-K.

### C. The Government's Evidence is not Unfairly Prejudicial

The broad standard of admissibility created by Rules 401 and 402 is bounded by the authority granted to the Court under Rule 403 to exclude relevant evidence "if its probative value is substantially outweighed by a danger of…unfair prejudice." *Unfair* prejudice is the standard—essentially all relevant evidence the government seeks to admit in a criminal case is, by its very nature, prejudicial. "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis." *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993).

Almadaoji simply states that evidence of terrorism is "unquestionably prejudicial." Doc. 63, PageID# 441. He does not articulate why any prejudice caused by the government's evidence—which demonstrates that terrorists engage in terrorist activities—is *unfair* to him in light of the fact that the government has charged him with, in essence, attempting to become a

terrorist. Almadaoji has been charged with attempting to commit an act that is difficult for most to understand or condone, but that does not make the proof of that charge unfair. This is, in fact, the conclusion reached by the very first case Almadaoji cites in his motion:

> This statement [defendant's endorsement of the attacks against the World Trade Center and the U.S.S. Cole in a television interview] touches on very sensitive issues for Americans…It is difficult to understand how a juror listening to such statements could do so without having his or her emotions stirred. On the other hand, jurors in criminal trials are asked to listen to justifications for all sorts of conduct that they cannot understand and do not condone; yet they are instructed at the conclusion of the trial to determine whether, element by element, the prosecution has met its burden of proof. They are presumed to follow such instructions.

*United States v. Mostafa*, 16 F.Supp.3d 236, 262 (S.D.N.Y. 2014). The *Mostafa* court ultimately admitted the evidence in question because, while prejudicial, it was not *unfairly* prejudicial in the context of the actions of which the defendant was accused—including the nature of the group he was charged with supporting. *See id*. Here, the government is seeking to introduce evidence concerning what ISIS and ISIS-K are and what they do, because it has charged Almadaoji with attempting to join ISIS and ISIS-K and operate under their direction and control. Evidence demonstrating what that *means* is undoubtedly prejudicial, but it is not unfairly so.

Even when the government's proof depicts graphic violence, the resulting prejudice is not unfairly prejudicial. As noted by the *Mostafa* court, statements concerning the 9/11 attacks and the attack on the U.S.S. Cole "refer to what are, to Americans, the most public of all of al Qaeda's acts against America and its people. The references are not, therefore, gratuitous." *Id*. at 263. The most graphic videos at issue here demonstrate beheadings—the most public of all of ISIS's and ISIS-K's attacks against the western world. Indeed, for many in the United States, ISIS burst into the public conscious with the beheading of journalist James Foley, the first American citizen publicly killed by ISIS. That this depiction is the grim calling card of the organization that Almadaoji sought to join, and that it is likely to fall beyond the approval of the

11

average juror, is a commentary on the nature of ISIS and Almadaoji's crimes, not the impropriety of the government's proof.

Almadaoji cites to *United States v. al-Moayad* for the proposition that Courts "frequently exclude such evidence [of terrorism] where it I[s] not closely linked to the charged conduct." Doc. 63, PageID# 442.  But *al-Moayad* is readily distinguishable from the present case, and does not support Almadaoji's contention that exclusion of terrorism evidence is the norm.  *See United States v. Pugh*, 162 F.Supp.3d 97, 114-15 (E.D.N.Y. 2016) (collecting cases from various circuits in which terrorist propaganda materials were admitted as evidence and noting that "[t]he Second Circuit has regularly allowed terrorist propaganda to be admitted, particularly in the context of material support offenses, in order to prove the *mens rea* element of the offense.").  In *al-Moayad*, a government witness testified "at length," in an "extended presentation" about a bus bombing carried about by Hamas in which the witness had been a victim.  *United States v. al-Moayad*, 545 F.3d 139, 159-62 (2d Cir. 2008).  The government established no connection between the defendant and the bombing, other than that the defendant had been charged with providing material support in the form of money to Hamas.  *See id*.  The witness was permitted to testify, repetitively, about his experiences studying in Jerusalem with his cousin; that he and his cousin were on their way to see their family and took a bus; that there was a catastrophic explosion on the bus; and, finally, that his cousin died on that bus.  *See id*. at 160.  This testimony was offered to demonstrate the defendant's knowledge that Hamas engaged in terrorist activity, as well as to address arguments about predisposition.  *See id*.

The *al-Moayad* court ruled that this testimony was unduly prejudicial under Rule 403 for multiple reasons.  First, the government failed to establish, through other admissible evidence, any connection between the defendant and the bus bombing.  *See id*. at 160-62  Second, the

12

defendant offered to stipulate his knowledge that Hamas was a terrorist organization involved in violent acts—"essentially eliminating the government's burden of proof on that element." *Id*. at 160.  Third, the "eyewitness account of a violent, destructive, and fatal suicide bombing seem[ed] quite clearly to involve conduct more inflammatory than the charged crimes." *Id*. at 161 (internal quotation marks omitted).  Fourth, the district court refused to give a limiting instruction designed to mitigate the prejudicial effect of the testimony.  Finally, the court noted that there had been "considerable testimony during other parts of the trial about notorious terrorist attacks carried out by Hamas," which rendered the probative value of the inflammatory eyewitness account of a man who watched his cousin die cumulative and minimally probative. *See id*. at 160.

None of those factors on which the *al-Moayad* court relied are present in this case.  First, the government is not seeking to introduce highly inflammatory evidence completely without connection to Almadaoji.  Rather, the depictions of violence that the government seeks to introduce are linked to Almadaoji in various ways.  Some of the videos were located on his phone—a phone he was carrying at the time of his arrest immediately prior to boarding a flight to Kazakhstan.  The still images were located on a tablet used by Almadaoji and recovered from his residence.  The testimony of CHS 3 concerns videos that Almadaoji himself disseminated.  Other videos are linked to an email account controlled by Almadaoji.  The government's evidence is not of gratuitous violence simply designed to inflame the jury.  Rather, it is evidence of what Almadaoji viewed, disseminated, or possessed related to ISIS, ISIS-K and violence.  The

13

possession or viewing of such material has been an important factor in admitting similar evidence in other courts. *See, e.g., Pugh*, 162 F.Supp.3d at 116-118 (collecting cases).[6]

Second, and addressed in greater detail below, Almadaoji has *not* offered to eliminate the government's burden of proof as to his knowledge of ISIS and ISIS-K. He instead merely has offered to stipulate that those organizations are designated as foreign terrorist organizations—a materially different concession for multiple reasons.

Third, the depictions of violence here are not "more inflammatory than the charged crimes"—they are the essence of the charged crime. The defendant in *al-Moayad* was charged with being a financier—simply providing money as something of a pass-through entity. The evidence offered by the government about what the defendant understood that money to be used for was of a vague nature. Indeed, many of the statements of the defendant captured in the *al-Moayad* opinion demonstrate that the defendant in that case frequently represented that the money in question would be used for charitable purposes and demurred on the subject of explicit terrorist financing. *See al-Moayad*, 545 F.3d at 149-50. In this case, Almadaoji is explicit about what he wants to do—provide himself to ISIS and ISIS-K in order to receive training to enable him to effectively carry out violent actions in the names of those organizations. Almadaoji's conversations with CHS 1, for example, are rife with Almadaoji's contemplation of grand plans

---

[6] *Pugh* itself did exclude a 34-second video showing a depiction of President Obama's face being riddled with bullet holes and displaying the words "Kill Obama." *See id*. The court excluded that video because it "depicted nothing about ISI[S]' operations or goals" and, in any event, was in Arabic, which the court implies the *Pugh* defendant did not understand. That makes the excluded video in *Pugh* unlike the government's proffered evidence here in multiple ways. First, the government's videos in this case are news-like or documentary pieces—not simply isolated clips of violence. The violence depicted in those videos is likewise not isolated, but is part of the propaganda story that ISIS and/or ISIS-K was advancing in the video as a whole. Second, Almadaoji *does* speak and read Arabic, and so the nature and context of the violence in the videos would not have been lost on him.

to assassinate individuals, violently topple the U.S. government, attack military and government targets, and the means he will require to do so.  Almadaoji did not seek to be a financier—he sought to be a soldier.  The government's proffered evidence informs the jury what, in the context of ISIS and ISIS-K, being a soldier means.  What being a soldier in ISIS and ISIS-K means is most directly proven by showing the jury what soldiers in ISIS *do*—an issue for which the government's proffered evidence serves as direct evidence.

Fourth, the government is not opposed to an appropriate instruction from the Court that accurately informs the jury of the purposes for which the proffered evidence may be considered. "Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions." *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002).  An appropriate limiting instruction would ensure that the jury considered this evidence only for its appropriate purposes, for example to establish Almadaoji's state of mind or intent.

Finally, *al-Moayad* noted that there had been considerable testimony about notorious terrorist acts committed by Hamas.  Almadaoji's motion would foreclose that possibility in this case because it seeks to bar the government from producing *any* proof of ISIS's and ISIS-K's violent actions.  Rule 403 is a balancing test, in which the probative value of a piece of evidence is weighed against any *unfair* prejudice—and only excluded when the probative value is *substantially* outweighed.  The *al-Moayad* court found, in part, that the eyewitness testimony was not very probative (and so substantially outweighed) because the government had been able to produce a considerable amount of *other evidence* concerning violence.  That is, the eyewitness testimony was simply cumulative, and so unbalanced in its prejudicial nature.  If the government in this case sought to introduce gratuitous and voluminous depictions of violence committed by

15

ISIS and ISIS-K, each depiction would, sequentially, become less relevant. [7] However, select depictions of violence are highly probative of what ISIS and ISIS-K *are*, and what they *do*. They are also probative of what Almadaoji thought being a soldier in ISIS and ISIS-K *meant*.

The government's proffered video evidence contains two explicitly violent acts carried out by ISIS or ISIS-K and the testimony of CHS 3 will reference, but not show, a third. The *Pugh* court allowed the display of a similar number of incidents as probative and admissible. *Pugh* allowed an edited video (cut right before a beheading takes place),[8] describing it as a "highly relevant" video which spoke "directly to the charged conduct (joining ISIL abroad)." *See Pugh*, 162 F.Supp.3d at 117-18. The court also allowed a second edited video that showed "ISIL fighters rounding up half-clothed prisoners and, ultimately, forcing them to lie down in a sprawling human pile. The excerpt leaves out scenes depicting the mass execution of the prisoners." *Id*. (quoting the government's description of the video in that case). The court found this depiction relevant for the same reasons as the first video—it depicted the conduct of ISIS fighters and so was "highly probative of state of mind." *See id*. While the court acknowledged that the actions were disturbing, it could not conclude that the prejudice significantly outweighed the probative value. *See id*. Almadaoji is charged with essentially the same conduct— attempting to become a fighter for ISIS and ISIS-K, and so the government's evidence of violent acts carried out by ISIS and ISIS-K is likewise highly probative.

---

[7] As stated in footnote 3, the evidence proffered here represents only a small sampling of videos and images that were collected from Almadaoji's electronic devices or accessed by Google accounts linked to Almadaoji and that depict violent and graphic conduct by ISIS and/or ISIS-K.

[8] The government is prepared to conduct limited editing of the videos in question to blur or redact the actual moment of execution. In the event of such edits or redactions, the government would still argue that testimony describing the redacted portions (as opposed to playing them in their entirety) would be appropriate.

16

### D.  The Proposed Stipulation is Insufficient

Finally, Almadaoji argues that his proposed stipulation creates an evidentiary alternative to the display of or testimony concerning any violent acts, eliminating their probative value. This is incorrect.

Almadaoji offers to stipulate that "ISIS and ISIS Wilayat Khorasan have been designated as foreign terrorist organizations." Doc. 63, PageID # 443.  This stipulation is insufficient for several reasons.

First, the proposed stipulation is facially inadequate even on the element it seemingly attempts to address.  The statute Almadaoji is charged with violating states that Almadaoji must have had "knowledge that the organization is a designated terrorist organization…, that the organization has engaged or engages in terrorist activity…, or that the organization has engaged or engages in terrorism." 18 U.S.C. § 2339B.  As such, the element in question provides the government alternative means or theories of satisfying it.  Almadaoji is offering to stipulate— without context—to the most anodyne theory of proof:  that ISIS and ISIS-K are terrorist organizations because they are named on a list of terrorist organizations that the government created.  This stipulation attempts to force the government not just to omit particular evidence, but adhere only to a specific theory of the case—one selected by the defense.  Accepting such a stipulation, and holding that said stipulation would bar the government from the presentation of any evidence or testimony that ISIS and ISIS-K commit violent acts would rob the government of its full ability "to convince the jurors that a guilty verdict would be morally reasonable" and violate "the familiar, standard rule that the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case *as the Government chooses to present it*." *Old Chief*, 519

17

U.S. at 186-87 (emphasis added). As such, to satisfy the charged element even facially, a stipulation would need to acknowledge that not only are ISIS and ISIS-K designated terrorist organizations, but also that they engage in terrorist activity and terrorism, as well as explaining what all those terms mean in this context--ultimately, an explicit acknowledgement of violent action.

What is more, even the exception to the "familiar, standard" rule created by *Old Chief* has no place in this case. The Supreme Court *explicitly* stated, "our holding is limited to cases involving proof of felon status…Rule 403…is not satisfied by a mere showing of some alternative means of proof that the prosecution in its broad discretion chose not to rely upon." *Id*. at 183, n. 7. The Sixth Circuit has consistently rejected defendants' attempts to expand the reasoning of *Old Chief* beyond its specific exception and force the government to accept stipulations in other contexts. *See United States v. Luck*, 852 F.3d 615, 624 (6th Cir. 2017) (collecting cases). The general rule against requiring the government to stipulate away its case "remains applicable to the prosecutor's introduction of sensitive or gruesome evidence to prove elements of an offense." *United States v. Boyd*, 640 F.3d 657 (6th Cir. 2011) (collecting cases). Here, the fact that ISIS and ISIS-K commit violent acts, the defendant's knowledge thereof, and proof of those specific violent acts, constitute an element of the charged offense.

However, even a more fulsome stipulation, one which accounted for each alternative means of proving that ISIS is a terrorist organization, would fall short of rendering the government's evidence of such acts substantially less probative than prejudicial because depictions of violent acts carried out by ISIS and ISIS-K connected to Almadaoji (the depictions, not the acts) are probative of more than just that element. As demonstrated above, the depictions are also probative of Almadaoji's *knowledge* of ISIS's and ISIS-K's involvement in terrorist

18

activities, and of Almadaoji's state of mind and intent—all concerns about which Almadaoji's stipulation is silent. The Sixth Circuit has recognized that evidence which has "multiple utility" stands in "stark contrast" to single-purpose evidence such as the fact of a prior felony conviction. *Luck*, 852 F.3d at 626. The *Luck* court held that such "multiple utility" evidence, in that case images of child pornography, was admissible even in the face of a stipulation and even where the evidence was likely to evoke a powerful emotional response from the jury:

> Unlike the felon-in-possession offense, child pornography cases are especially susceptible to a wide range of strong emotional responses, including disbelief that a defendant would commit the act in question. Showing the actual images paints a portrait far more vivid than a sanitized stipulation, thereby establishing for the jury its human significance, and in the process implicating the law's moral underpinnings and a juror's obligation to sit in judgment.

*Id*. The government's evidence in this case will likewise convey to the jury a more accurate understanding of what ISIS and ISIS-K are and what Almadaoji's intentions were than a simple stipulation that those groups are names on a list. A trial absent that evidence will lack the "moral underpinnings" of the basis for Almadaoji's crime.

Eliminating evidence of violence in a terrorism trial also violates "the need for evidence in all its particularity to satisfy the jurors' expectations about what the proper proof should be." *Old Chief*, 519 U.S. at 188. In a case in which the government has alleged that the defendant attempted to *join* ISIS and ISIS-K, those expectations will be inescapable—and the government must not be put in the position in which the "triers of fact may penalize the party who disappoints them by drawing a negative inference against that party." *Id.*

## III.    CONCLUSION

For all the reasons outlined above, the government should be permitted to put on evidence depicting and describing specific, violent acts committed by ISIS and ISIS-K.  As such, the government respectfully requests that Almadaoji's motion be denied.


Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney


s/Nicholas Dingeldein
NICHOLAS DINGELDEIN (NY 5284674)
DOMINICK S. GERACE (OH 0082823)
Assistant United States Attorneys
JUSTIN SHER
Trial Attorney
200 West Second Street, Suite 600
Dayton, OH 45402
(937) 225-2910
Nicholas.dingeldein@usdoj.gov
Dominick.S.Gerace@usdoj.gov
Justin.Sher@usdoj.gov

20

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served this 24th day of September, 2021, on defense counsel via the Court's ECF system.

s/Nicholas Dingeldein
NICHOALS DINGELDEIN
Assistant United States Attorney