```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
 2                WESTERN DIVISION AT DAYTON

 3    UNITED STATES OF AMERICA,

 4                      Plaintiff,

 5         Vs.                    CASE NO. 3:18-cr-158

 6    NASER ALMADAOJI,

 7                      Defendant.

 8
                      TRANSCRIPT OF PROCEEDINGS
 9
      PRESIDING:  THE HONORABLE WALTER H. RICE
10
      DATE:  Monday, September 27, 2021
11
      APPEARANCES:
12
      For The Plaintiff:
13
      VIPAL J. PATEL,
14    Acting United States Attorney
      By:  Dominick S. Gerace, II, Esq.
15         Nicholas A. Dingeldein, Esq.
           Assistant United States Attorneys
16         200 West Second Street, Suite 600
           Dayton, Ohio  45402
17         (937) 225-2910
           Dominick.s.gerace@usdoj.gov
18         Nicholas.dingeldein@usdoj.gov

19    United States Department of Justice
      National Security Division
20    By:  Justin Sher, Esq.
           950 Pennsylvania Avenue, NW
21         Washington, DC
           (202) 353-3909
22         Justin.sher@usdoj.gov

23

24

25
```

1    For The Defendant:

2    Bieser, Greer & Landis
     By:  James P. Fleisher, Esq.
3         6 North Main Street, Suite 400
          Dayton, Ohio  45402
4         (937) 223-3277
          Jpf@biesergreer.com
5
     Court Reporter:  Debra Lynn Futrell, CRR
6                     Federal Building
                      200 West Second Street
7                     Dayton, OH  45402
                      (937) 512-1511
8                     Debra_Futrell@ohsd.uscourts.gov

9     Proceedings recorded by mechanical stenography, transcript
                      produced by computer
10
                     INDEX TO EXAMINATIONS
11
                     D     X     RD    RX
12
     Jack Tripoli      3     20    43    46
13
     FBI TFO Kyle Metz  49    64
14
     Naser Almadaoji    70    73
15
                             - - -
16

17                   Monday, September 27, 2021

18                    IN OPEN COURT

19                       9:23 a.m.

20        THE COURT:  We have this morning case CR-3-18-158,

21   United States of America versus Naser Almadaoji.  The

22   Defendant is in open court with counsel, Mr. James Fleisher.

23   The government is represented by Assistant United States

24   Attorneys, Mr. Dominick Gerace, and Mr. Nicholas Dingeldein.

25   Mr. Justin Sher is participating by telephone and I take it

1    that the gentleman, at least to my left, is your first

2    witness, Mr. Gerace.  If you would be good enough to call

3    him.

4              MR. GERACE:  Yes, your Honor.  Your Honor, the

5    government calls Officer Jack Tripoli.

6              THE COURT:  Officer, good morning to you.

7              THE WITNESS:  Good morning, your Honor.

8              THE COURT:  Would you good enough to raise your

9    right hand.

10                         JACK TRIPOLI,

11              after having been first duly sworn,

12                   testified as follows:

13              THE COURT:  Mr. Gerace.

14              MR. GERACE:  Thank you, your Honor.

15                      DIRECT EXAMINATION

16   BY MR. GERACE:

17   Q.   Officer Tripoli, can you hear me okay?

18   A.   I can.

19   Q.   Can you please state your name for the record.

20   A.   Jack Tripoli.

21   Q.   Can you tell the Judge how you are employed.

22   A.   I am an officer with the U.S. Customs and Border

23   Protection, Department of Homeland Security.

24   Q.   How long have you been employed as such?

25   A.   13 years.

1    Q.    What is your duty station?

2    A.    Chicago.  O'Hare International Airport.

3    Q.    Can you tell the Judge what your duties are as a

4    customs officer?

5    A.    Yes.  It's to enforce both customs and immigration

6    laws.

7    Q.    As a customs officer, do you conduct what is

8    customarily known as secondary screenings of passengers that

9    are arriving into O'Hare International Airport?

10   A.    Yes.

11   Q.    What is a secondary screening?

12   A.    Basically it's more detailed questioning about a

13   traveller's trip and, you know, what they did on their trip.

14   Just getting more information about their overall travel.

15   Q.    How does secondary screenings come about?

16   A.    Typically they can be referred from the primary officer

17   which is the immigration officer conducting the immigration

18   port of the exam or it can be referred from a baggage

19   control secondary officer which is the officer conducting

20   the baggage inspection portion of the process.

21   Q.    You mentioned you have approximately 13 years of

22   experience as a customs officer, is that right?

23   A.    That's correct.

24   Q.    Over that time, could you estimate how many secondary

25   screenings you've conducted?

1    A.    Tens of thousands.

2    Q.    When you're conducting a secondary screening, Officer

3    Tripoli, what are you generally looking for?

4    A.    There's a lot:  The person's behavior, their ability to

5    articulate what they did on their travel, where they went on

6    their travel, and if the items that they are in possession

7    of are consistent with where they travelled to and the story

8    that they're giving.

9    Q.    Is part of the reason to conduct a secondary screening

10   to be on the lookout for potential criminal activity?

11   A.    Yes, that's correct.

12   Q.    As a customs officer, do you have training looking for

13   evidence or indications of criminal activity?

14   A.    Yes.

15   Q.    What kind of training do you receive for that?

16   A.    So, we receive both classified and unclassified

17   briefings about current threats.  Then we, also, have

18   received numerous training through the Federal Law

19   Enforcement Training Center throughout the 13 years that

20   I've been employed.

21   Q.    What types of criminal activity are you on the lookout

22   for when you're conducting a secondary screening?

23   A.    So the unit that I'm assigned to is generally focussed

24   on terrorism.

25   Q.    You mentioned you're stationed at O'Hare International

1    Airport in Chicago, is that right?

2    A.   That's correct.

3    Q.   As a part of your duties, do you know that O'Hare

4    International Airport accepts international flights?

5    A.   It does, yes.

6    Q.   Can O'Hare often be the first point of entry into the

7    United States for passengers arriving from another country?

8    A.   Yes.

9    Q.   Do you receive training and are you aware of what is

10   known as a border search?

11   A.   Yes.

12   Q.   Based on your training, is it your understanding that

13   O'Hare international can be considered the functional

14   equivalent of a border because it accepts international

15   flights?

16   A.   That's correct.

17   Q.   I want to turn your attention, Officer Tripoli, to the

18   date of February 24, 2018.  Do you have that date in mind?

19   A.   Yes.

20   Q.   Were you on duty at O'Hare on that day?

21   A.   Yes.

22   Q.   On that day did you encounter an individual named Naser

23   Almadaoji?

24   A.   I did.

25   Q.   Can you tell the Court how it was that you came to

1    encounter Mr. Almadaoji?

2    A.    Yes, so he was referred to me by Officer Nagy who

3    was --

4    Q.    Officer Tripoli, you cut out there.  Can you repeat

5    your answer to that question, please.

6    A.    Yes, he was referred to me by Officer Nagy who was

7    assigned to baggage control secondary on that day.

8    Q.    So, was this something you would call a cold referral?

9    A.    Yes.

10   Q.    Was Mr. Almadaoji arriving into O'Hare from an overseas

11   destination?

12   A.    He was.

13   Q.    Do you remember what that destination was or?

14   A.    Yes, Frankfurt, Germany.

15   Q.    This would have been Mr. Almadaoji's first point of

16   entry into the United States at O'Hare?

17   A.    That's correct.

18   Q.    Officer Nagy you said referred him to you for a

19   secondary.  Can you tell the Court sort of how this

20   secondary screening is set up once someone is referred to

21   you?

22   A.    Yes.  So they are basically escorted over to us.  We

23   have a separate area where it's generally away from the

24   travelling public and that's where we began our interviews.

25   Q.    Can you describe what that area is like?

1    A.    Yes.  So it's basically the same immigration booth that

2    a normal traveller would go to.  They are just in an area

3    away from the travelling public that's semiprivate.

4    Q.    So you mentioned a booth.  Would you be seated in a

5    booth?

6    A.    Yes, seated or standing.

7    Q.    Then where would the individual that you're

8    interviewing be positioned in relation to you?

9    A.    Right across the counter from me.

10   Q.    At some point you conducted an interview of Mr.

11   Almadaoji?

12   A.    That's correct.

13   Q.    How did that interview begin?

14   A.    Basically just by confirming the information that the

15   subject supplies on their customs declaration form at the

16   time they enter the U.S.

17   Q.    Before we go any further, did you author a report

18   related to your interactions with Mr. Almadaoji on February

19   24th, 2018?

20   A.    I did.

21   Q.    I'm going to ask you to refer to what the government

22   has marked as Government Exhibit A that we provided you a

23   copy of.  Do you have that in front of you?

24   A.    I do.

25   Q.    Do you recognize what that is?

1    A.    Yes.

2    Q.    Tell the Court what it is.

3    A.    Basically it's a report that we're required to complete

4    any time that we do a secondary examination of a passenger.

5    Q.    Is this the report that you completed with respect to

6    your secondary examination of Mr. Almadaoji?

7    A.    Yes.

8    Q.    I'm going to ask you -- and if you need to refer to

9    your report, that's fine -- about what time in the day did

10   that interview start?

11   A.    That was about 1405 hours.

12   Q.    So 2:05 in the afternoon?

13   A.    That's correct.

14   Q.    Then what time did the interview end?

15   A.    About 1556 hours.

16   Q.    So is it fair to say the interview took about an hour

17   and 50 minutes?

18   A.    Yes.

19   Q.    Let's talk about the format of your interview.  Do you

20   have a set or does CBP have a set -- let me say that

21   differently.  Are there questions or certain data that

22   you're required to collect as a part of this interview?

23   A.    Yes.

24   Q.    I want to direct your attention to Government's Exhibit

25   A sort of the bottom of the first page and then on to the

1    second page.  It looks like there's 14 categories of

2    information there.  Do you see that?

3    A.    Yes.

4    Q.    Can you tell the Judge about those 14 categories?

5    A.    Yeah.  Again so that our port policy is to include and

6    obtain all that information.  Anytime we're doing a

7    secondary examination, it's pretty much a pre-approved

8    template, so to speak, by our port.

9    Q.    Are you asking these questions upfront or do you kind

10   of cover them throughout the interview?

11   A.    It can be done either way but generally it's through

12   the flow of an interview.

13   Q.    I want to direct your attention to page 2 of the

14   report.  There's a number 12 which says:  Current address

15   and telephone number.  Do you see that?

16   A.    Yes.

17   Q.    Did you collect that information from Mr. Almadaoji?

18   A.    I did both off the customs declaration form --

19   Q.    Can you repeat that?

20             THE COURT:  One moment, sir.  Off the customs

21   immigration form and what else?

22             THE WITNESS:  Verbally.

23             THE COURT:  Thank you.

24   BY MR. GERACE:

25   Q.    So the phone number there, just to be clear for the

1   Court, you would have obtained verbally from Mr. Almadaoji?

2   A.   That's correct.

3   Q.   In your secondary screenings in general, do you

4   customarily ask verbally for a phone number for the person

5   you're interviewing?

6   A.   Always, yes.

7   Q.   So, Mr. Almadaoji provided his phone number for you

8   verbally?

9   A.   That's correct.

10  Q.   Let me ask you, if you had asked a question to an

11  individual about what their phone number was and they

12  refused to give it to you, would you have documented that in

13  the report?

14  A.   Yes, absolutely.

15  Q.   Why would you have documented it?

16  A.   It's considered what we determine as like a passenger

17  protest.  It's just an articulable fact that we use in the

18  process of our interview to conduct a more progressive exam.

19  Q.   So during the interview, did you also ask other

20  biographical or personal information of Mr. Almadaoji?

21  A.   Yes.

22  Q.   That includes his address which was listed in number

23  12?

24  A.   Correct.

25  Q.   How about his email address, did you ask him what a

1  good email address for him would be?

2  A.   Yes.

3  Q.   I'm going to direct your attention to page 5 of your

4  report.  At the top do you see where it says:  Email:

5  Nasermunshid16@gmail.com?

6  A.   Yes.

7  Q.   Did you obtain that email address from Mr. Almadaoji

8  verbally?

9  A.   I did.

10  Q.   Again in relation to the same question I asked you

11  about the phone number, do you customarily ask passengers

12  for email addresses?

13  A.   Yes.

14  Q.   Had a passenger such as Mr. Almadaoji declined to give

15  you that, would you have documented that in your report?

16  A.   Yes.

17  Q.   Right below on page 5 of your report is a Snapchat

18  account.  Do you see that?

19  A.   Yes.

20  Q.   Did you obtain that information from Mr. Almadaoji

21  verbally as well?

22  A.   That's correct.

23  Q.   I'm going to direct your attention right below where we

24  talked about that in the Snapchat.  On your report, it says:

25  Apps on his phone.  Do you see that?

1    A.    Yes.

2    Q.    At some point during the interview of Mr. Almadaoji,

3    did you obtain Mr. Almadaoji's cellular telephone from him?

4    A.    I did.

5    Q.    If you could tell the Court -- and again if you need to

6    refer to your report, that's fine -- about how long into the

7    interview did you obtain Mr. Almadaoji's cellular telephone

8    from him?

9    A.    Approximately six minutes.

10    Q.    I'm going to ask you to repeat that.  It kind of cut

11    out a little bit.  I'm sorry.

12    A.    Approximately six minutes.

13    Q.    Six minutes.

14    A.    Yes, sir.

15    Q.    The report says it's a Samsung Galaxy with a certain

16    IME number that's listed on the report?

17    A.    Correct.

18    Q.    Is it fair to say you didn't ask him for his phone

19    right away when you began the interview?

20    A.    That's correct.

21    Q.    Why did you decide to ask for his phone about six

22    minutes into the interview?

23    A.    Typically, you know, after just basic questioning, you

24    know, his overall story and his inability to articulate a

25    lot of details about his trip, and then also concerns over

1    some of the areas that he had travelled to, and then again

2    having no photos of his trip was concerning.

3    Q.    Let me back up there.  You mentioned no photos of his

4    trip.  You weren't able to obtain that information until

5    after you looked at his phone, is that right?

6    A.    No.  I had asked him to provide if he had any photos.

7    Then we, also, conducted a bag exam in which he had cameras

8    in his luggage that --

9    Q.    Finish your sentence, sir, if you would.

10    A.    I'm sorry?

11          THE COURT:  She's going to read what she got from

12    your testimony but you broke up at the end.  So I'd like you

13    to hear what you said and then finish the sentence if you

14    would.

15          (Record read.)

16          THE WITNESS:  Conducted a bag exam in which he had

17    numerous cameras in his luggage that contained no photos.

18          THE COURT:  Thank you, sir.

19    BY MR. GERACE:

20    Q.    Officer Tripoli, you mentioned you've done thousands of

21    these secondary screenings.  Do you obtain and search every

22    phone that comes across the border during these screenings?

23    A.    No.

24    Q.    How often would you say during the secondary screenings

25    that you actually conduct a search of a cellular telephone?

1    A.    More likely than not that we do not search a phone.

2    Q.    Had Mr. Almadaoji not raised your suspicions, would you

3    have obtained his phone?

4    A.    No.

5    Q.    When you obtained the phone from Mr. Almadaoji, how did

6    that work?  Did you ask for it?  Describe that process for

7    the Judge.

8    A.    Yes.  So basically we have a process in which we

9    provide the subject what's called an electronic tear sheet

10   that basically explains the process, our authority to obtain

11   and search phones and then we will voluntarily -- we will

12   ask the subject to voluntarily submit to a search and also

13   provide their password for their phone as well have the

14   subject place that into airplane mode.

15   Q.    In this case did Mr. Almadaoji voluntarily unlock the

16   phone?

17   A.    He did.

18   Q.    Did he himself place it into airplane mode?

19   A.    Yes.

20   Q.    Did you then at some point actually look through the

21   phone?

22   A.    Yes.

23   Q.    Can you just describe for the Court, did you look

24   through the phone all at once or was it in conjunction with

25   your interview of Mr. Almadaoji?

1    A.    No, it's done in conjunction with the entire interview,

2    so it's done off and on.

3    Q.    Is it fair to say then you were kind of looking at it

4    while talking to him?

5    A.    Correct.

6    Q.    Were you looking at it the whole time you were talking

7    to him or intermittently?

8    A.    No, intermittently.

9    Q.    Let's talk about the character of the search.  How did

10   you go about searching the phone?

11   A.    So what I conducted is what is to be referred as to a

12   basic exam or a manual exam which is basically a casual

13   browsing of the phone.

14   Q.    Is that essentially like thumbing through or scrolling

15   through your own phone?

16   A.    Yes, absolutely.

17   Q.    At any time when you had Mr. Almadaoji's phone, did you

18   hook it up to any forensic evaluation equipment?

19   A.    No.

20   Q.    Did you download it at all to a drive or a cloud or

21   anything like that?

22   A.    No.

23   Q.    Did you generate any kind of forensic report?

24   A.    No.

25   Q.    So, during your search of the phone, how did you

1  document what you saw or did not see in the phone?

2  A.   Basically on the report that I have listed.

3  Q.   Is it fair to say then that anything you would have

4  seen in the phone would have been documented in this report?

5  Anything of note at least.

6  A.   Correct.

7  Q.   Is this report the only place where that information

8  would lie?

9  A.   Correct.

10  Q.   Can you tell the Judge a little bit about what you

11  observed through your manual search of the phone?

12  A.   Yeah.  So there wasn't many photos besides two or three

13  of his itinerary.  Nothing in regards to where he claimed he

14  travelled to or what he did on his trip.  There were apps.

15  The only ones on there were the ones that I have listed.

16  That was basically it.  It was a pretty, what we call a bare

17  and empty phone.

18  Q.   Officer Tripoli, I'm going to direct you to page 5 of

19  your report because you mentioned apps that you had listed.

20  Are those the apps that are listed under the section of the

21  report that says Apps On His Phone?

22  A.   That's correct.

23  Q.   Can you repeat that answer?  You cut out a little bit.

24  A.   That's correct.

25  Q.   It says:  Text Now App, Hadith App, and Kik App.  It

1    looks like a username of Naser Munshid?

2    A.   That's correct.

3    Q.   I want to ask you, right above again that area on your

4    report, there was a Snapchat account listed, is that right?

5    A.   Yes.

6    Q.   If you had seen a Snap app on his phone, would you have

7    documented it under the Apps On His Phone section?

8    A.   Yes, I would have.

9    Q.   Let's talk a little bit about the rest of the

10   interview.  If you could just tell the Court generally, you

11   had mentioned earlier that you had taken the phone based on

12   some answers that Mr. Almadaoji had given you.  Did any

13   other answers or comments that Mr. Almadaoji made during

14   your interview give you cause for concern?

15   A.   Yes.  He made quite a few, like, anti-American

16   comments.  Also some of the articles of clothing he had and

17   in his luggage he had what he referred to as shemagh that

18   were items that he had seen on fighters, along with the fact

19   that he had visited some areas where there was current

20   conflict and known terrorism present.

21   Q.   Following your interaction with Mr. Almadaoji, and you

22   completed the interview, did you return his phone to him?

23   A.   I did.

24   Q.   Is it safe to say you drafted what's marked as

25   Government's Exhibit A; your report?

1    A.    That's correct.

2    Q.    Did you then contact the FBI about Mr. Almadaoji?

3    A.    I contacted our JTTF which is the Joint Terrorism Task

4    Force which, yes, is pretty much the equivalent to the FBI.

5    Q.    Did you have a contact from, is it a CBP officer that's

6    a task force officer with the FBI on the JTTF?

7    A.    Yes, that's correct.

8    Q.    That would have been the person you would have

9    contacted?

10   A.    Yes.

11   Q.    You referred to contacting them.  How did you contact

12   them, do you remember?  Was it by email?

13   A.    Yes, through email, correct.

14   Q.    Eventually did you send this whole report to the FBI?

15   A.    Yes.

16   Q.    Aside from the information that's contained in this

17   report, did you provide any other information about the

18   contents of Mr. Almadaoji's phone to the FBI?

19   A.    No.

20              MR. GERACE:  Your Honor, may I have a moment?

21              THE COURT:  Take your time, sir.

22              (Brief pause.)

23   BY MR. GERACE:

24   Q.    Thank you, Officer Tripoli.

25              MR. GERACE:  Your Honor, I have no further

1    questions at this time.

2         THE COURT:  Thank you.  Mr. Fleisher on cross.

3         MR. FLEISHER:  Thank you, your Honor.  May I

4    remove the mask?

5         THE COURT:  Yes.

6         MR. FLEISHER:  Thank you.

7                   CROSS-EXAMINATION

8    BY MR. FLEISHER:

9    Q.   Good morning, Officer Tripoli.  My name's James

10   Fleisher.  I represent the Defendant Naser Almadaoji in this

11   case.  You and I have never had an opportunity to meet or

12   speak about this case, is that correct?

13   A.   That's correct.

14   Q.   Have you testified previously in this matter or in any

15   other court proceedings?

16   A.   Yes, in other proceedings, yes.

17   Q.   Related to this case or unrelated?

18   A.   No, unrelated.

19   Q.   Have you reviewed any documentation outside of the

20   report that was referenced in your direct examination in

21   preparation for your testimony here today?

22   A.   No.

23   Q.   Your testimony, do you have any independent

24   recollection of the events of that border inspection on

25   February 24, 2018, or is your testimony based from your

1    review of documentation that you prepared?

2    A.   No.  I have independent knowledge of the events.

3    Q.   The report that you prepared, Government's Exhibit A in

4    this hearing, indicates that your supervisor in February of

5    2018 was an officer -- forgive me if I am not pronouncing

6    this correctly.  Yadira Tejeda?

7    A.   That's correct.

8    Q.   It's T E J E D A, is that correct?

9    A.   That's correct.

10   Q.   Is Officer Tejeda still your supervisor?

11   A.   Currently, no.

12   Q.   After your interaction with Mr. Almadaoji in February

13   of 2018, did you have any conversations with Officer Tejeda

14   about this interaction?

15   A.   Conversation, no.

16   Q.   Did you report this to Officer Tejeda?

17   A.   I did.

18   Q.   Is that part of the ordinary process that you would

19   follow after every secondary screening or only in certain

20   instances?

21   A.   Anytime we refer something to JTTF or FBI or anytime we

22   encounter a subject of interest that requires being referred

23   on to another agency, we are instructed to include our chain

24   of command.

25   Q.   Were there any other CBP officers that you would have

1    notified about this interaction with Mr. Almadaoji other

2    than Officer Tejeda?

3    A.    Officer Knaga who was assigned to the task force for

4    JTTF.

5    Q.    What about Officer Nagy?  You indicated that you

6    received I believe a referral in this matter from Officer

7    Nagy who was at the first level baggage check, is that

8    correct?

9    A.    That's correct.

10   Q.    Have you had any conversations with Officer Nagy about

11   this interaction in preparation for your testimony here

12   today?

13   A.    No.

14   Q.    Can you describe the circumstances of Officer Nagy's

15   referral of Mr. Almadaoji to you?  In other words, did

16   Officer Nagy call you on the phone or come over personally

17   and contact you that day?

18   A.    No.  He walked over and spoke to me face to face.

19   Q.    What did he report to you that resulted in this

20   secondary referral?

21   A.    So he had concerns over the traveller's behavior and

22   inability to answer some of his questions and again places

23   that -- places in the world that the subject had travelled

24   to.

25   Q.    Are you familiar with what types of questions are posed

1    to travellers at that first level screening that Officer

2    Nagy would have performed with Mr. Almadaoji?

3    A.    Not typically.

4    Q.    However, one of Officer Nagy's roles that day would

5    have been to conduct some search of Mr. Almadaoji's baggage

6    and belongings?

7    A.    Typically, yes.

8    Q.    Are you aware if it is ever the case that a first level

9    baggage security check also involves checking the

10   individual's telephone?

11   A.    They are authorized to do that on their own but

12   typically they usually will not.

13   Q.    Are you aware in this instance if Officer Nagy had an

14   opportunity to review Mr. Almadaoji's cell phone?

15   A.    To my recollection, I do not believe he did, no.

16   Q.    Why do you say that, to your recollection?

17   A.    Because when he had walked him over to me, to my

18   recollection he did not do the telephone or any kind of

19   secondary examination.

20   Q.    Are you aware of how long Officer Nagy's interaction

21   with Mr. Almadaoji was before he was referred to you?

22   A.    No, I am not.

23   Q.    Did you have any contact with any other customs and

24   border patrol officers or any other law enforcement official

25   about Mr. Almadaoji before he was referred to you by Officer

1    Nagy?

2    A.    No.

3    Q.    Did Officer Nagy alert you to any particular items that

4    were uncovered in Mr. Almadaoji's luggage that were of

5    concern to him?

6    A.    Yes.

7    Q.    What was that?

8    A.    I believe he had four what are called shemaghs which

9    are kind of head scarves.

10   Q.    Have you been trained on the significance of shemaghs?

11   A.    Yes.

12   Q.    Are you familiar with their use culturally in various

13   Muslim cultures?

14   A.    Yes.

15   Q.    You're aware that oftentimes shemaghs have no political

16   or other significance.  It's a cultural item of clothing

17   that is worn traditionally in various Muslim cultures,

18   correct?

19   A.    Well, they have dual use.

20   Q.    But you would agree with me that one of those uses is

21   simple traditional cultural use, correct?

22   A.    It could be, yes.

23   Q.    You testified a little bit.  Let's talk a little bit

24   about the actual process that you followed there at the

25   booth that you were at?  Okay?

1    A.    Yes.

2    Q.    So you're located in a booth that has some type of

3    glass enclosure around it, is that fair?

4    A.    At that time because it was pre-COVID, no.

5    Q.    So it was an open-air interaction with Mr. Almadaoji?

6    A.    That's correct.

7    Q.    Was he standing throughout the interview that you

8    conducted on the other side of the booth?

9    A.    Off and on, yes.

10   Q.    This booth, does it contain a computer or other

11   electronic devices on your side of the booth?

12   A.    Computer, yes.

13   Q.    During the course of this interview, were you taking

14   notes of your interaction and questions and answers with Mr.

15   Almadaoji?

16   A.    Notes, just typing on the computer.

17   Q.    Are you actually entering in various data fields as you

18   go through or are you typing in a narrative?

19   A.    It's basically both.  It's basically the report that

20   you guys have in front of you.  We start conducting that as

21   we are speaking with the subject.

22   Q.    If I understand you correctly, this report that was

23   generated was generated realtime during the course of the

24   hour and 50 minute interaction or -- excuse me -- the

25   150-minute interaction with Mr. Almadaoji?

1    A.    Correct.

2    Q.    Is there a point in time or was there a point in time

3    after that interaction with Mr. Almadaoji where you went

4    back to this form that we see as Exhibit A and particularly

5    in the narrative section added additional information based

6    on your recollection?

7    A.    No, besides just checking for grammatical errors, no.

8    Q.    If I understand you correctly, Officer Tripoli, the

9    narrative section of this report beginning on page 2

10   underneath the 14 numbered items that were identified by Mr.

11   Gerace, continuing through page 3 and 4 and 5, were prepared

12   by you during the course of the interview with Mr. Almadaoji

13   in realtime?

14   A.    That's correct.

15   Q.    So at the end of that report we find on page 5 at the

16   top of that page an email address noted as

17   Nasermunshid16@gmail.com, do you see that?

18   A.    I do.

19   Q.    Your testimony on direct is that you obtained that

20   verbally from Mr. Almadaoji, is that fair?

21   A.    That's correct.

22   Q.    Yet you -- I think if I recall your testimony

23   correctly -- you indicated that you obtained that email

24   address earlier in the interview, in the beginning, correct?

25   A.    That's correct.

1   Q.   In the beginning of the interview would have been when

2   you would have obtained answers to the 14 numbered sections

3   of this report that are contained on pages 1 and 2, correct?

4   A.   That's correct.

5   Q.   So, is there a script that you follow at that point in

6   time initially in the interview to get answers to those

7   first 14 categories?

8   A.   No.  As I had testified, it's kind of done throughout

9   the flow of the interview.

10  Q.   And during the flow of the interview -- well, let me

11  ask you this.  In those the first 14 sections, there's no

12  reference to an email address, is that fair?

13  A.   That's correct.

14  Q.   Yet when you go to the end of the exhibit, page 5, you

15  do see the email address contained there, correct?

16  A.   That's correct.

17  Q.   It's your testimony that that specific information,

18  nasermunshid16@gmail.com, was provided to you verbally by

19  Mr. Almadaoji?

20  A.   That's correct.

21  Q.   Is it your process to also ask the individual for their

22  Snapchat username?

23  A.   Generally, any social media.

24  Q.   Is it your testimony that Mr. Almadaoji also verbally

25  provided you with the Naser underscore almadao, A L M A D A

1    O, username that would have been used in Snapchat?

2    A.    Yes.

3    Q.    Beneath that section of the report on page 5, do you

4    see apps on his phone and then there are three apps

5    identified, do you see that?

6    A.    Yes.

7    Q.    Those apps on his phone, if I understood your testimony

8    correctly, you derived that information from your

9    examination of the phone itself?

10   A.    That's correct.

11   Q.    You did not observe a Snapchat app on Mr. Almadaoji's

12   phone at that time?

13   A.    I did not.

14   Q.    Were those the only social media apps -- well, let me

15   ask you this.  Would you agree that Text Now is a social

16   media type application?

17   A.    That's correct.

18   Q.    Hadith app, are you familiar with that?

19   A.    Yes.

20   Q.    Is that also a social media application?

21   A.    Social media/messaging app, yes.

22   Q.    Kik, what is Kik, K I K?

23   A.    Basically the same.  It's like a person-to-person

24   messaging system similar to like Viber or Telegram or

25   WhatsApp.

1    Q.    Can you explain why earlier you testified that you

2    would get username information from the traveller verbally,

3    in this case, Mr. Almadaoji's Snapchat username for social

4    media sites but you did not appear to have obtained those

5    usernames from him verbally for those three apps listed that

6    you viewed on his phone?

7    A.    Well, when I had asked him for his social media

8    accounts, Snapchat was the only account that he offered up

9    verbally.

10   Q.    Did you obtain any other email addresses from Mr.

11   Almadaoji that day?

12   A.    No, just the one listed.

13   Q.    Again, on page 5, officer, you reference the Kik app

14   being identified and then parenthetically you see what

15   appears to be a username that would have been used on that

16   application, is that fair?

17   A.    That's correct.

18   Q.    Was that obtained from your review of the application

19   itself?

20   A.    That was.

21   Q.    So in other words, you had the phone and you're talking

22   to Mr. Almadaoji and you're pressing on certain apps to

23   review the contents of the app?

24   A.    That's correct.

25   Q.    Did those reviews that you would have done, would those

1   have been focussed on social media apps?

2   A.   Not generally, no.

3   Q.   Would you have checked the email application?

4   A.   I would have, usually, yes, verify that the email that

5   they provide to me verbally is accurate when I am looking

6   through the phone.

7   Q.   How do you do that, how do you verify that?

8   A.   Just simply by launching their, any kind of email

9   application that they have.

10  Q.   So your testimony is that you originally obtained Mr.

11  Almadaoji's email address verbally in the interview,

12  correct?

13  A.   Correct.

14  Q.   But then while you were reviewing the contents of his

15  phone, you confirmed that information by actually accessing

16  his email app and reviewing his email address there?

17  A.   I may or may not have reviewed it.  I don't recall

18  that.  Typically our practice is to do that.  But in this

19  case I don't recall because he had given it to me verbally.

20  Q.   Many people, I believe, when you click on an email icon

21  on their phone will have more than one email account

22  attached in that app function.  Are you familiar with that?

23  A.   I mean that could vary.  I have seen that and I have

24  not seen that.

25  Q.   Do you recall if Mr. Almadaoji's email app had more

1    than one email address associated with it?

2    A.    I do not recall.

3    Q.    You do not recall?

4    A.    I do not recall.

5    Q.    I'm sorry, officer.  Back to the booth so to speak.

6    Mr. Almadaoji you say six minutes into this interview

7    provided you with his phone at your request?

8    A.    That's correct.

9    Q.    Before providing it to you, you asked him to unlock the

10    phone and place it in airplane mode, is that correct?

11    A.    That's correct.

12    Q.    Why place it in airplane mode?

13    A.    Airplane mode prevents us from accessing anything

14    stored what's called in the cloud so anything that's not

15    actually on the phone we are unable to --

16              THE COURT:  Finish your sentence, if you would,

17    sir.  You broke up.

18              THE WITNESS:  Yes.  So generally we put it on

19    airplane mode so that we are unable to access anything that

20    the subject stored on their phone via cloud, anything that's

21    not stored.

22    BY MR. FLEISHER:

23    Q.    Is that a matter of policies and procedures that

24    Customs and Border Patrol follows or is that a decision you

25    made that day on your own?

1    A.    That's per our directive.

2    Q.    Per your what?  I'm sorry, sir.

3    A.    That's per our directive.

4    Q.    What directive are you referring to?  Just a general

5    policy and procedure document for these types of

6    interactions?

7    A.    Border search for electronic devices.

8    Q.    Forgive me if you already testified to this.  What is

9    the source of your recollection that Mr. Almadaoji provided

10   the phone to you approximately six minutes after the

11   interaction began?

12   A.    I'm sorry, can you repeat that?

13   Q.    Let me ask you this.  What is the source of your

14   recollection that Mr. Almadaoji provided the phone to you

15   six minutes after your interaction with him began?

16   A.    Because I document that while I'm doing the interview.

17   Q.    Where is it documented?  Forgive me if I missed that in

18   your testimony.

19   A.    On page 5, that it was -- I talked to the subject at

20   1405 hours and then took possession of his phone at 1411.

21   Q.    So I see on page 5 of Exhibit A:  Intercepted by TTRT

22   officer 1405 hours, do you see that?

23   A.    Yes.

24   Q.    Who is the TTRT officer?

25   A.    That would be myself.

1    Q.    What does TTRT stand for?

2    A.    Tactical Terrorism Response Team.

3    Q.    And that indicates that the interaction began at 1405

4    hours or 2:05 in the afternoon?

5    A.    Correct.

6    Q.    Where -- again, I'm sorry.  Where does it show that the

7    phone was provided to you six minutes later?

8    A.    That would be the last paragraph where it says that

9    TTRT Tripoli took possession of Samsung Galaxy with IME

10   number at 1411 hours.

11   Q.    Okay.  I see that.  It would have remained in your

12   possession until the completion of the manual examination as

13   the report indicates at 1556 hours?

14   A.    Yes.

15   Q.    At any point in time, officer, did you take the phone

16   away from the booth area that you occupied and take it to

17   another section or area of the customs area?

18   A.    No.

19   Q.    Does that booth or the computer that you're located at,

20   I understand you indicated that you did not do a forensic

21   search of Mr. Almadaoji's phone, but does that booth contain

22   equipment that is capable of performing such a search?

23   A.    No, it does not.

24   Q.    Did you in fact scroll through Mr. Almadaoji's phone

25   during the course of the interview from approximately 1411

1    hours until the completion of the interview at 1556 hours?

2    A.   Correct.

3    Q.   So the phone would have been, if I understand it

4    correctly, after the initial six minutes of the interview,

5    you obtained the phone.  It was placed in airplane mode by

6    Mr. Almadaoji.  It was unlocked by Mr. Almadaoji.  You

7    reviewed the contents of the phone and interviewed Mr.

8    Almadaoji simultaneously?

9    A.   Correct.  So interviewing and scrolling through the

10   phone was done throughout the interview back and forth.

11   Q.   I assume while you were doing that, on occasion you

12   would put the phone down and type certain information into

13   the computer, correct?

14   A.   Correct.

15   Q.   Officer Tripoli, I think you said in direct examination

16   that you obtained certain information -- it might have been

17   address information; I'm not sure.  I want to ask you --

18   from a customs declaration form, do you recall that?

19   A.   Yes.

20   Q.   What information would be contained on the customs

21   declaration form?

22   A.   Typically name, address, passport information,

23   countries visited, as well as customs questions in regard to

24   agricultural and items.

25        THE COURT:  One moment.  Read back what you have.

1    Then, officer, finish if you would, sir.

2              (Record read.)

3              THE WITNESS:  I'm sorry, I didn't hear what she

4    said.

5              (Record read.)

6              THE WITNESS:  That they are bringing back with

7    them.

8              THE COURT:  Go ahead, sir.

9    BY MR. FLEISHER:

10   Q.   So that form would not include the cell phone number of

11   the traveller, is that correct?

12   A.   That's correct.

13   Q.   And it would also not include the email addresses used

14   by that traveller?

15   A.   That's correct.

16   Q.   Officer, I think you indicated that while you were

17   examining the contents of the phone -- strike that.  You

18   indicated on direct that one of the causes of concern that

19   you had was that Mr. Almadaoji reported having travelled in

20   a certain area and did not have any photograph or

21   photographic evidence of that trip, is that correct?

22   A.   That's correct.

23   Q.   I think you said there were several cameras in his

24   luggage, is that fair?

25   A.   Correct.

1    Q.   I think there was a Go Pro camera, correct?

2    A.   Yes, Go Pro.  I believe a couple Go Pro cameras.  More

3    than one, I believe.

4    Q.   You reviewed the contents of those cameras, is that

5    correct?

6    A.   Yes.

7    Q.   In other words, they were digitally stored in the

8    cameras or they would be if photographs were contained in

9    the cameras?

10   A.   Yes.

11   Q.   You did not notice or see any signs of or pictures of

12   this particular trip, is that fair?

13   A.   Yeah, there were zero photos.

14   Q.   Did you also review the photographs that might have

15   been contained on Mr. Almadaoji's cell phone while you were

16   doing the examination?

17   A.   Yes.

18   Q.   What did that involve, simply pressing on the photo

19   app?

20   A.   Yes.

21   Q.   And then did you examine various photographs that were

22   taken?

23   A.   Yes.

24   Q.   And did not notice any photographs there that would

25   have been evidence of this trip?

1    A.    No, that's not correct.  He had I believe two or three

2    photos of his itinerary was all.

3    Q.    You testified that before you do that examination you

4    provide the traveller -- in this case Mr. Almadaoji -- with

5    an electronic tear sheet, is that correct?

6    A.    Yes.

7    Q.    Does your office keep a copy of that tear sheet?

8    A.    I mean we have stacks of those, so yes.

9    Q.    That would be located somewhere in your office there in

10   Chicago at this point or would it be moved on to a storage?

11   A.    No.  I mean, the electronic tear sheet is a general

12   sheet that's given to any traveller that we perform a phone

13   exam on.  So I mean we have stacks of those in every one of

14   the interview posts that we use.  It's a generic form.

15   Q.    A few more questions about your report that's

16   Government's Exhibit A here today.  If you look at the first

17   page of that report in the section identified as Remarks

18   about two-thirds of the way down the page.  Are you there?

19   A.    I'm sorry, what page?

20   Q.    Page 1 of 5 on Government's Exhibit A.

21   A.    Okay.

22   Q.    In the Remarks section about two-thirds of the way down

23   the page, you see:  Reason For Secondary Referral.  Do you

24   see that entry?

25   A.    Correct.

1    Q.    It says:  JTTF Tecs Record.  The secondary referral, is

2    that your referral to the Joint Terrorism Task Force after

3    this interview, is that what that reflects?

4    A.    Are you asking in regards to the reason for secondary

5    referral?

6    Q.    Yes.  What does *Reason For Secondary Referral* mean?

7    A.    That would be my referral to JTTF that a tecs record

8    was placed on him after the encounter.

9    Q.    That portion of the report would have been filled out

10   later in the interview, is that fair?

11   A.    At the conclusion of the interview.

12   Q.    As we look at this report and the remarks, it's not

13   necessarily entered chronologically as you look at the

14   report, is that fair?

15   A.    That's correct.

16   Q.    In other words, this reason for secondary referral,

17   even though it's identified as one of the very first entries

18   in the Remarks section, you completed that at the conclusion

19   of the interview, is that fair?

20   A.    Before releasing the subject, yes.

21   Q.    Would the same process be true for the 14 numbered

22   entries beginning with Purpose Of Trip and ending with

23   Additional Appropriate Information, would it also be the

24   case that those entries may have been entered in a

25   nonchronological fashion?

1    A.   Yes, that's correct.

2         MR. FLEISHER:  Your Honor, may I have a moment to

3    consult with my client?

4         THE COURT:  Certainly.  Take your time.

5         (Pause in proceedings.)

6         THE COURT:  Continue if you would, sir.

7         MR. FLEISHER:  Thank you, your Honor.

8    BY MR. FLEISHER:

9    Q.   Officer Tripoli, just a few more questions for you,

10   sir.  Referring again to Government's Exhibit A, your report

11   as generated, there is the acronym at the top of the report

12   that's called Tecs, T E C S.  What does that stand for?

13   A.   That's a law enforcement database that we use.

14   Q.   At the beginning of the report, there's an Incident

15   Type category.  It indicates terrorist related.  Is that

16   something you would have a related or would that have been

17   generated by the report maker above, looks like Matthew

18   Knaga, K N A G A?

19   A.   Where is that being referred to?

20   Q.   Incident Type at the top left-hand section of the first

21   page of Government's Exhibit A.

22   A.   No.  That is in regards to what type of report is being

23   generated.

24   Q.   Is that automatically entered when a report gets

25   generated at a later time?

1    A.    No.   That's entered while the report is being

2    generated.

3    Q.    This report appears to have been generated by Matthew

4    Knaga, K N A G A, on March 6, 2018, is that correct?

5    A.    Correct.

6    Q.    It indicates in the Summary section that the incident

7    date was February 24, 2018, fair?

8    A.    Yes.

9    Q.    The incident time was 16:10 hours or 4:10 p.m.  Would

10   that have been -- the incident time have been something you

11   would have entered or would that have been generated at some

12   later time?

13   A.    That's just generated when the report is either started

14   or completed.  It's something the system generates.

15   Q.    That section the system generates?

16   A.    Correct.

17   Q.    A few final questions about the process by which Mr.

18   Almadaoji was brought to the booth before you had the

19   interaction with him that you've described.  Do you recall

20   if Officer Nagy brought Mr. Almadaoji over to your booth,

21   escorted him there?

22   A.    Yeah.  As I testified earlier, he was walked over.

23   Q.    And at that point in time or shortly after that point

24   in time, approximately five or six -- six minutes later I

25   think you testified -- you went through the interaction with

1    Mr. Almadaoji to obtain his telephone, correct?

2    A.    Yes.

3    Q.    You would have explained to him that there was an

4    electronic tear sheet that you had to provide to him at that

5    time, correct?

6    A.    Yes.

7    Q.    Did you indicate to him what would occur if he refused

8    to provide you with the cell phone for an examination?

9    A.    No because he voluntarily unlocked the phone and gave

10   the pass code.  However, the tear sheet does explain to them

11   what would happen if they refused and then I would verbally

12   explain to him had he refused.

13   Q.    Are you certain that -- well, let me ask you this.  The

14   tear sheet indicates if the traveller refuses, the phone may

15   be seized and examined without their consent, is that a fair

16   summary?

17   A.    Somewhat.

18   Q.    Clarify it for me.  What does it say?

19   A.    Basically that it can be detained by us for an

20   examination by a forensic laboratory if they refuse to

21   unlock their phone voluntarily.

22   Q.    Are you certain that you did not provide that guidance

23   verbally to Mr. Almadaoji that day?

24   A.    Again, I didn't have to because he voluntarily unlocked

25   it.  However, the sheet does explain to them, and they are

1    given the opportunity to read that over before consenting to

2    the search.

3    Q.    Are you aware if Officer Nagy had any discussions with

4    Mr. Almadaoji about the process of the search of his phone?

5    A.    No, I cannot testify to that.

6    Q.    Was there ever a point in time where you were examining

7    the phone of Mr. Almadaoji where he was seated for a period

8    of time away from the booth in a separate area?

9    A.    Yes.

10   Q.    Describe that for us, if you would.

11   A.    I mean, that's just typical.  It's national security

12   concerns whenever we're viewing a phone we don't typically

13   allow a person to, quote-unquote, look over our shoulder and

14   we're not required to allow them to do that as well.

15   Q.    So where was he seated while you were examining the

16   phone?

17   A.    In eye view maybe five to ten feet, max, away from me.

18   Q.    He would have been in a chair at that point?

19   A.    Correct.

20   Q.    Your earlier testimony, what I understood it to say is

21   that Mr. Almadaoji was -- that you were reviewing the

22   contents of the phone and interviewing him simultaneously

23   from approximately 1411 hours until 1556 hours.  Is that a

24   fair summary of your testimony?

25   A.    Yes.

1   Q.   What period of time was Mr. Almadaoji seated in a

2   separate area while the phone was being examined?

3   A.   I don't recall the exact time.

4   Q.   Would a period of approximately 20 to 30 minutes sound

5   about right?

6   A.   Again, I couldn't give you an exact time.

7         MR. FLEISHER:  That's all I have, your Honor.

8   Thank you.

9         THE COURT:  Thank you, Mr. Fleisher.  Mr. Gerace,

10  redirect.

11        MR. FLEISHER:  Thank you, your Honor.

12                    REDIRECT EXAMINATION

13  BY MR. GERACE:

14  Q.   Officer Tripoli, I just have a few questions for you.

15  You mentioned on cross that Officer Nagy would have brought

16  Mr. Almadaoji over to you for the secondary screening, is

17  that right?

18  A.   Correct.

19  Q.   You were asked whether or not you had knowledge of

20  Officer Nagy having searched Mr. Almadaoji's phone before he

21  brought it over to you, do you remember that?

22  A.   Yes.

23  Q.   Would Officer Nagy typically, if he had conducted a

24  search of that level, have notified you of that?

25  A.   Yes.

1    Q.    Do you recall if he notified you of that?

2    A.    I do not recall, no.

3    Q.    When Mr. Almadaoji arrived at your booth, he had his

4    phone on him, is that right?

5    A.    That's correct.

6    Q.    In fact, Mr. Almadaoji had to unlock the phone and

7    provide it to you at that point?

8    A.    Correct.

9    Q.    So Officer Nagy did not, when he brought Mr. Almadaoji

10   over to you, have possession of Mr. Almadaoji's phone, is

11   that right?

12   A.    That's correct.

13   Q.    I want to talk a little bit about the format of your

14   report.  On cross you testified this report, you know, the

15   order that things are in the report are not necessarily

16   chronological, is that fair?

17   A.    Correct.

18   Q.    So, towards the end of the report, you have a list of

19   sort of, looks to me to be kind of a summary of sort of

20   biographical information on page 4 going into page 5, where

21   it has the address, the telephone number, the email address,

22   and the Snapchat, do you see that?

23   A.    Yes.

24   Q.    So the fact that that information is located on page 4

25   or 5 doesn't necessarily mean chronologically that's where

1    you gathered it during the interview, is that fair to say?

2    A.    It is.  Just a basic summary of the overall report.

3    Q.    You were asked on cross, Officer Tripoli, about email

4    applications.  Specifically, counsel asked you about

5    clicking on an email app and having multiple email accounts,

6    do you remember that question?

7    A.    Yes.

8    Q.    Did you list in your report the presence of any email

9    application actually on Mr. Almadaoji's phone?

10    A.    No.

11    Q.    Had you seen multiple email addresses during the search

12    of the phone, would you have typically listed every email

13    address that you saw?

14    A.    Absolutely.

15    Q.    I want to talk a little bit about airplane mode.  It

16    sounds to me -- you said that airplane mode, that's part of

17    your process as part of the directive that you have for

18    doing these type of searches?

19    A.    That's correct.

20    Q.    Is it actually fair to say that placing the phone in

21    airplane mode restricts your ability to see more information

22    about these passengers that are travelling through O'Hare?

23    A.    That early, yes, that's correct.

24    Q.    Finally, you were asked about shemaghs and the dual

25    use.  Can you just tell the Court, did you ask Mr. Almadaoji

1    about the shemaghs in his bags?

2    A.   I did.

3    Q.   What did he say about those?

4    A.   He said that he had them because he liked the way that

5    they looked on fighters that he saw online.

6            MR. GERACE:  Your Honor, may I have one moment?

7            THE COURT:  Yes.

8            (Brief pause.)

9            MR. GERACE:  Nothing further, your Honor.  Thank

10   you.

11           THE COURT:  Mr. Fleisher, recross, sir.

12           MR. FLEISHER:  Thank you, your Honor.  May I have

13   a moment?

14           (Brief pause.)

15                       RECROSS-EXAMINATION

16   BY MR. FLEISHER:

17   Q.   Officer Tripoli, do you have any recollection as to

18   whether Mr. Almadaoji also indicated to you that shemaghs

19   were traditional headware in certain Muslim cultures?

20   A.   No, I do not have recollection of that.

21   Q.   One last question for you.  Mr. Gerace asked you a few

22   questions about page 5 of Exhibit A, the section that at the

23   top of that page that references Email, Snapchat, and Apps

24   On The Phone.  You've testified about the three apps that

25   are social media or messaging-type apps:  Text Now, Hadith,

1    and Kik.  Is there any reason why you did not obtain user

2    information for the Text Now app and the Hadith app or at

3    least it's not referenced in your report?

4    A.    Yeah because some apps will restrict you from

5    referencing usernames when it's on airplane mode.  So I was

6    unable to obtain those due to airplane mode.

7    Q.    Thank you, officer.

8              MR. FLEISHER:  Thank you, your Honor.

9              THE COURT:  You're welcome.  Mr. Gerace.

10             MR. GERACE:  Nothing further, your Honor.

11             THE COURT:  Officer, just one or two questions if

12   I might.  When Officer Nagy brought Mr. Almadaoji over to

13   you, did he indicate what his concerns were and why he was

14   asking you to do a secondary interview?

15             THE WITNESS:  Yes, he did.  He said he had some

16   national security concerns based on where the subject had

17   travelled to and his unwillingness to answer some basic and

18   routine questioning.

19             THE COURT:  All right, sir.  The electronic tear

20   sheet, I'm assuming from your testimony it contains only

21   some information as to your authority to request his phone

22   and what happens if the person you're interviewing declines

23   your request, is that accurate?

24             THE WITNESS:  Yes.

25             THE COURT:  Again, I'm certain you've testified to

1    this -- two things.  You indicated he made a number of what

2    you thought were anti-American comments.  I take it those

3    comments are in your narrative, is that accurate?

4              THE WITNESS:  Yes, your Honor.

5              THE COURT:  Lastly, this you may have testified

6    to.  Reasons for secondary referral.  JTTF tecs record.

7    Would you explain what that means.

8              THE WITNESS:  Yes.  That's basically the action

9    that I took which means I referred it on to JTTF and created

10   a tecs record of the encounter.

11             THE COURT:  Again, pardon me if you've already

12   answered this.  What does JTTF stand for?

13             THE WITNESS:  It's the Joint Terrorism Task Force.

14             THE COURT:  All right, sir.  Thank you, Officer.

15   Let's see if the attorneys have any followup.  Mr. Gerace.

16             MR. GERACE:  No, your Honor, thank you.

17             THE COURT:  And Mr. Fleisher.

18             MR. FLEISHER:  No, your Honor.  Thank you.

19             THE COURT:  All right.  Officer, thank you for

20   your time, sir.  It's much appreciated.  You're welcome to

21   sign off.

22             THE WITNESS:  Thank you.

23             THE COURT:  It's 20 minutes of 11.  Let's be in

24   recess until five minutes of.  We are in recess.

25             (Recess taken at 10:39 a.m.)

```
1                         IN OPEN COURT

2                         11:06 a.m.

3            THE COURT:  Mr. Gerace, your next witness.

4            MR. GERACE:  Your Honor, the government calls FBI

5    Task Force Officer Kyle Metz.

6                         KYLE METZ,

7            after having been first duly sworn,

8                  testified as follows:

9            THE COURT:  Mr. Gerace, proceed if you would.

10           MR. GERACE:  Thank you, your Honor.

11                   DIRECT EXAMINATION

12   BY MR. GERACE:

13   Q.   Good morning.

14   A.   Good morning.

15   Q.   Would you please state your full name for the Court?

16   A.   Kyle Metz.

17   Q.   Please tell the Court how you are employed.

18   A.   I'm a detective with the Greene County sheriff's

19   office.

20   Q.   How long have you been a detective with Greene County?

21   A.   I've been with the sheriff's office for 22-1/2 years.

22   I've been a detective for the last 13-1/2 years.

23   Q.   As part of your duties as a detective with the Greene

24   County sheriff's office, are you assigned to the FBI?

25   A.   I am.
```

1    Q.    In what capacity?

2    A.    I am a Task Force Officer assigned to the Joint

3    Terrorism Task Force in the Dayton Resident Agency office.

4    Q.    Joint Terrorism Task Force is JTTF for short?

5    A.    That is correct.

6    Q.    How long have you been assigned to the JTTF in Dayton?

7    A.    Since January of 2017.

8    Q.    What are some of your duties as a task force officer

9    for the JTTF?

10   A.    I am assigned to investigate for assessments or

11   investigations of international domestic terrorism.

12   Q.    Do you act as a case agent or co-case agent on

13   counterterrorism investigations?

14   A.    I do.

15   Q.    Were you a co-case agent during the investigation of an

16   individual named Naser Almadaoji?

17   A.    I was.

18   Q.    Can you tell the Judge briefly how it was that the FBI

19   first came to investigate Mr. Almadaoji.

20   A.    The FBI was contacted by Customs and Border Protection,

21   CBP.  They provided a written report as to an interaction

22   with Mr. Almadaoji at an airport.

23   Q.    Was that interaction with Mr. Almadaoji on or about

24   February 24, 2018?

25   A.    It was.

1    Q.    Was that at the O'Hare International Airport?

2    A.    It was.

3    Q.    When did the FBI in Dayton open an investigation

4    regarding Mr. Almadaoji?

5    A.    It was initially opened early March.  I believe on the

6    9th.

7    Q.    Of 2018?

8    A.    Yes.

9    Q.    You mentioned a report from CBP, did you not?

10    A.    I did.

11    Q.    Did the FBI receive a report from CBP regarding the

12    interactions that an officer Jack Tripoli had with Mr.

13    Almadaoji at O'Hare International Airport?

14    A.    We did.

15    Q.    I want to just direct your attention --

16            MR. GERACE:  If the witness could be provided

17    Government's Exhibit A, please.

18            (Whereupon, the courtroom deputy clerk handed said

19    document to the witness.)

20    BY MR. GERACE:

21    Q.    Sir, do you recognize that document?

22    A.    I do.

23    Q.    Can you tell the Court what it is?

24    A.    This is the U.S. Customs and Border Protection report

25    that was provided by Officer Jack Tripoli to the FBI.

1    Q.    Did you review that report as part of your

2    investigative activities regarding Mr. Almadaoji?

3    A.    I did.

4    Q.    Based on your review of the report, were you aware that

5    Officer Tripoli had actually conducted a manual search of

6    Mr. Almadaoji's phone during the interaction on February 24,

7    2018?

8    A.    Yes, it is part of the report.

9    Q.    Are you aware whether the report details some

10    information regarding the search of Mr. Almadaoji's phone?

11    A.    It does.

12    Q.    Aside from the information that's listed in that

13    report, did the FBI receive any other information from CBP

14    Officer Tripoli about the results of the manual search of

15    Mr. Almadaoji's phone?

16    A.    We did not.

17    Q.    In addition to information in that report about the

18    phone, does the report also contain specifically

19    biographical or other identifying information regarding Mr.

20    Almadaoji?

21    A.    It does.  It provides a name, address, date of birth,

22    also email address, phone number.

23    Q.    Did you also review the narrative of that report

24    regarding what statements Mr. Almadaoji made during the

25    interview?

1    A.    I did.

2    Q.    Based on its review of the information provided from

3    CBP about Mr. Almadaoji, did the FBI determine that this

4    referral warranted further investigation?

5    A.    We did.

6    Q.    After the FBI receives a referral like this and

7    determines that further investigation is warranted, what

8    general investigative steps might it take?

9    A.    We take our general logical investigative steps by

10   searching already-known databases of FBI and other law

11   enforcement records.  We, also, conduct open source searches

12   for publicly available information, specifically on the

13   Internet.

14   Q.    In this case, did you do that?

15   A.    We did.

16   Q.    Do you look for social media accounts or other sort of

17   Internet platform accounts that an individual that you're

18   investigating might be in control of?

19   A.    Yes, we did.

20   Q.    Why is that?

21   A.    Typically, if you want to know a lot about a person in

22   this day and age, you go to social media.  You can learn

23   quite a bit about the person, their likes, dislikes and any

24   other information that they're willing to put out there.

25   Q.    You mentioned open source checks earlier.  Is the FBI

1    able to tell whether a defendant has a certain social media

2    account or on-line presence using open source checks?

3    A.    Yes, we can.

4    Q.    Tell the Court what an open source check is.

5    A.    Open source check, we have an automated tool that takes

6    the information like a telephone number or an email address,

7    and it does a search, an automated search for the agent to

8    basically take the significant amount of time that would be

9    required to sit in front of a computer and search and it

10   does it for you and gets it back in a much quicker fashion.

11   It tells you any publicly facing available information that

12   you could find by just sitting down in front of a computer

13   and searching like Goggle and any other search engine.

14   Q.    Is it fair to say *open source* is synonymous with

15   publicly available information?

16   A.    It is.

17   Q.    In addition to the tools you mentioned, do you often

18   just, or do agents in the FBI as part of your duties just

19   conduct Google searches of names, addresses and telephone

20   numbers and things of that nature?

21   A.    We do.

22   Q.    In this case with respect to Mr. Almadaoji, did you

23   utilize open source checks?

24   A.    We did.

25         MR. GERACE:    I'd like to show the witness, please,

1    if I could Government's Exhibit B.

2              (Whereupon, the courtroom deputy clerk handed said

3    document to the witness.)

4    BY MR. GERACE:

5    Q.    Sir, do you recognize what's been marked as

6    Government's Exhibit B?

7    A.    I do.

8    Q.    Can you please tell the Court what that exhibit is?

9    A.    It's a reporting form for the open source queries

10   conducted in this matter.

11   Q.    Just to page through to make sure the Court understands

12   what we have here, the first four pages, they seem to be

13   Bates Numbered, is that correct?

14   A.    That is correct.

15   Q.    These are documents that were produced to the Defendant

16   in discovery, is that your understanding?

17   A.    Yes, that's my understanding.

18   Q.    Then the following four pages, those are essentially

19   reproductions of information on previous pages just blown up

20   in color so it's easier to read, is that fair to say?

21   A.    That is correct.

22   Q.    The first page of Government's Exhibit B, it lists a

23   date.  What's the date on there?

24   A.    The listed date is June 11, 2018.

25   Q.    That's when these open source queries would have been

1    conducted in or around that time?

2    A.    That is correct.

3    Q.    Is that fairly early on in the investigation of Mr.

4    Almadaoji?

5    A.    Yes.

6    Q.    Can you describe now if we could, Task Force Officer

7    Metz, just paging through here, what these various pages

8    show?

9    A.    Okay.  What would be page 5 of the blown-up portion of

10   the chart shows on the left-hand side Original Facility

11   Searched.  That is the information that you are searching, a

12   telephone number, an email address.

13   Q.    It shows a telephone number, 1-937-969-0509?

14   A.    That is correct.

15   Q.    Where did the FBI obtain that phone number from?

16   A.    From the CBP report.

17   Q.    Then there's an email address of -- we're going to skip

18   to the last email address here, Nasermunshid16@gmail.com.

19   A.    Yes.

20   Q.    Where did the FBI obtain that email address from?

21   A.    That also came from the CBP report.

22   Q.    The second entry there, the email address, it's A B U B

23   A D R A L I R A Q I @Gmail.com?

24   A.    Yes.

25   Q.    How did the FBI get that email address?

1    A.    After receiving this initial information from CBP, a

2    subpoena was sent to Google for the Gmail, the

3    nasermunshid16 Gmail email address for information, and the

4    abubadraliraqi Gmail.com email was a recovery email for the

5    Nasermunshid16.

6            MR. GERACE:  I'd like to show, if I could, the

7    witness what was marked or attached to the motion, the

8    recent motion filed by the defense as Exhibit B, please.

9            (Whereupon, the courtroom deputy clerk handed said

10   document to the witness.)

11   BY MR. GERACE:

12   Q.    Task Force Officer Metz, do you recognize that

13   document?

14   A.    I do.

15   Q.    Can you please tell the Court what that is.

16   A.    This is an official FBI document that was drafted by

17   Task Force Officer Charles Balaj, Special Agent Patrick

18   Gragan in regards to, looks like the Telegram account found

19   in the open source search.

20   Q.    Does this document list some investigative steps that

21   the FBI took with regard to Mr. Almadaoji?

22   A.    It does.

23   Q.    I want to direct your attention to page 4 of that

24   document, please.  It looks like sort of the third paragraph

25   does where it says:  On or about May 10, 2018?

1    A.    Yes.

2    Q.    Can you just read that into the record for us, please.

3    A.    "On or about May 10, 2018, Google LLC provided a

4    response to a subpoena served on or about May 10, 2018 for

5    nasermunshid16@gmail.com.

6              THE COURT:  Sir, you're going to have to slow down

7    a bit when you're reading.  Thank you.

8              THE WITNESS:  In the response, Google LLC provided

9    subscriber information, including the name Abu Ahmad.  Phone

10   number 937-969-0506 as the SMS number associated with the

11   account, and recovery email address

12   abubadraliraqi@gmail.com.

13   BY MR. GERACE:

14   Q.    The phone number that's listed there, that looks pretty

15   close to the facility that was searched that's listed on

16   Government's Exhibit B.  Can you tell the Court, was that a

17   typo in this particular report with the 0506?

18   A.    I believe so, yes.

19   Q.    Let's turn back, if we could, Task Force Officer Metz

20   to Government's Exhibit B.  Sorry for the multiple Bs.  We

21   talked about the three facilities that the FBI searched on

22   these open source checks.  Can you just tell the Court what

23   the results were for each facility?

24   A.    Yes.  For the telephone number, the only account

25   located was a Telegram account.  For the email address

1    abubadraliraqi@gmail.com, there was a Google account and a

2    Twitter account.  For the nasermunshid16@gmail.com, there

3    was a Google account, also Skype, SoundCloud, Tango, and

4    Tumbler.

5    Q.    If you turn to pages 7 and 8 of that exhibit, what do

6    those two pages show?

7    A.    These are the final portions of the report of the open

8    source search.  It provides a spreadsheet including which

9    facility that was searched, which platform it found, if

10   there is a publicly available profile photo, if there is a

11   user ID available, a username, a display name, a full name

12   or an email address.  Also phone number, gender, other

13   content that's uncategorized, websites, last on-line if it's

14   available, the date processed, and a screen shot if

15   available.

16   Q.    It looks for these results for 7 and 8 for the

17   different accounts that are reflected here, not all of those

18   categories of information are present on the spreadsheet?

19   A.    That is correct.

20   Q.    Is it fair to say that whenever information was

21   publicly available it would have been reflected on here?

22   A.    That is correct, at the time of the search.

23   Q.    Let's key in on the phone number, the top line on page

24   7, the facility that you testified to, that came off of the

25   CBP report.  It looks like that phone number showed it was

1    associated with a Telegram account, is that right?

2    A.    That is correct.

3    Q.    What was the username for that Telegram account?

4    A.    AbuMuhammad16.

5    Q.    Was there a user ID associated with the account as

6    well?

7    A.    There is.

8    Q.    What's the difference for Telegram, based on your

9    training and experience, between a user ID and a username?

10   A.    The user ID is permanent and constant.  Whereas, a

11   username can be changed.

12   Q.    Through the course of the investigation here, did the

13   FBI learn that the username for this user ID had been

14   changed at some point?

15   A.    Yes.  It was changed from abumuhammad16 to

16   abumuhammad19.

17   Q.    Task Force Officer Metz, is this open source query

18   information regarding the phone number that's listed here on

19   Government's Exhibit B, the first time that FBI learned that

20   the phone number provided by Mr. Almadaoji to CBP was

21   associated with a Telegram account?

22   A.    Yes.

23   Q.    After learning of this information, were there

24   subsequent investigative steps taken by the FBI to determine

25   what the user of that Telegram account was doing on

1    Telegram?

2    A.    Yes.

3    Q.    Were some of those subsequent investigative steps the

4    use of confidential human sources and undercover officers?

5    A.    That is correct.

6    Q.    Through those subsequent investigative steps, did the

7    FBI determine there was cause for concern based on the

8    Telegram communications that were occurring for this

9    particular Telegram user?

10    A.    We did.

11    Q.    At some point did the undercover officer arrange to

12    meet through Telegram with the user of this account?

13    A.    Yes.

14    Q.    Who showed up to those meetings?

15    A.    Mr. Naser Almadaoji.

16    Q.    Going back to Government's Exhibit B, there's two email

17    addresses listed in multiple social media platforms that

18    were associated with those.  Did the FBI also look for other

19    evidence regarding those social media platforms?

20    A.    We did.

21    Q.    You mentioned Google, Skype, SoundCloud, Tango, Tumbler

22    just to name a few.  Did the FBI issue multiple subpoenas to

23    these agencies in order to gather information for this

24    investigation?

25    A.    We did.

1    Q.    Did the FBI, in fact, eventually obtain federal search

2    warrants for the two email accounts that were listed on

3    Government's Exhibit B?

4    A.    We did.

5    Q.    In addition to this tool that we just talked about, you

6    had mentioned that agents often just used Google in their

7    investigation.  Did agents employ Google here with respect

8    to Mr. Almadaoji?

9    A.    We did.

10   Q.    I want to direct your attention back to defense Exhibit

11   B and specifically page 3.  Let me know when you're there.

12   A.    Yes.

13   Q.    If you look down sort of at the second full paragraph

14   where it says:  Subsequent investigative steps revealed a

15   YouTube account.  Can you tell the Court how the FBI was

16   able to find this YouTube account that's referenced in this

17   paragraph?

18   A.    Simply a search on Google of the name Naser Almadaoji.

19   Q.    The subsequent paragraph, it reads:  Also observed was

20   a SoundCloud account.  Can you tell the Court how the FBI

21   found that SoundCloud account?

22   A.    Again, the use of Google.

23   Q.    Is it fair to say the FBI issued a number of subpoenas

24   in this case?

25   A.    Yes, that's correct.

1    Q.    For various social media accounts or on-line type

2    accounts?

3    A.    That is correct.

4    Q.    Did any of those subpoenas that the FBI sent out

5    result -- were any of those subpoenas the result of the

6    manual search information in the CBP report?

7    A.    No.

8    Q.    Your understanding is that the phone number and email

9    account that were listed in the CBP report were obtained

10   verbally from Mr. Almadaoji at the time of the interview?

11   A.    Yes, that is my understanding.

12              MR. GERACE:  Your Honor, may I have one moment?

13              THE COURT:  Certainly.

14              (Brief pause.)

15   BY MR. GERACE:

16   Q.    Thank you, Detective Metz.

17              MR. GERACE:  No further questions at this time,

18   your Honor.

19              THE COURT:  Thank you, Mr. Gerace.  Mr. Fleisher,

20   for no other reason than my own scheduling, how long do you

21   feel your cross will take?

22              MR. FLEISHER:  Your Honor, I think it will take

23   five to 7 minutes.  I don't have much.

24              THE COURT:  All right, sir.  Thank you.  Please

25   proceed.

1           MR. FLEISHER:  Perhaps less, your Honor.  I don't

2    know.

3                        CROSS-EXAMINATION

4    BY MR. FLEISHER:

5    Q.   Good morning, Officer Metz.  I'm Jim Fleisher.  I

6    represent Mr. Almadaoji.  We've met before, have we not?

7    A.   We have.

8    Q.   I have a few questions for you based on the testimony

9    that you provided in direct.  The first being, if I

10   understand your testimony correctly, this was originally

11   referred to the FBI in roughly March of 2018, is that right?

12   A.   That's correct.

13   Q.   That was maybe three weeks after Mr. Almadaoji's

14   interaction with the customs officials in Chicago?

15   A.   Approximately, yes.

16   Q.   Then if I understand the chronology correctly, sometime

17   after that, the FBI and yourself took the email address

18   information that was derived from the customs report and

19   issued a subpoena to Google for information, is that right?

20   A.   That's correct.

21   Q.   That return came back on approximately I think you said

22   May 10 of 2018 or around there?

23   A.   Yes.

24   Q.   Then it was almost three or so weeks later that you

25   indicated that you and the FBI conducted the open source

1    queries on June 11 of 2018, is that right?

2    A.    That's correct.

3    Q.    The report identified as Government's Exhibit B, the

4    FBI form indicates that it was drafted by Patrick A.

5    Gragan, do you see that?

6    A.    Yes.

7    Q.    Was Officer Gragan the author of this report?

8    A.    Yes.

9    Q.    Were you involved in those queries yourself personally?

10   A.    No.   He submitted the query to the automated system and

11   wrote the report.

12   Q.    Officer Gragan apparently, if this report is correct,

13   submitted the phone number 937-969-0509, is that correct?

14   A.    That's correct.

15   Q.    Along with nasermunshid16@gmail.com email address,

16   correct?

17   A.    That's correct.

18   Q.    Then the abubadraliraqi@gmail.com address as well?

19   A.    That's correct.

20   Q.    The phone number and the nasermunshid16@gmail.com

21   information was derived from the customs report only,

22   correct?

23   A.    Correct.

24   Q.    The abubadraliraqi@gmail.com address was from the

25   Google return on the subpoena?

1    A.    That's correct.

2    Q.    Is it, in your experience, the ordinary process for an

3    open source query to be conducted after the issuance of

4    subpoenas to on-line providers?

5    A.    Yes, it can happen any way; before or after.

6    Q.    It's not necessarily a process that's followed, it's as

7    the investigators determine warranted?

8    A.    Yes.

9    Q.    The open source queries are all publicly available

10   information that can be derived from the Internet?

11   A.    Yes.

12   Q.    Am I understanding you correctly?

13   A.    Yes.

14   Q.    So the process that you used or the software that you

15   use sort of amalgamates that information into a spreadsheet,

16   is that fair?

17   A.    Yes.

18   Q.    But if I'm understanding you correctly, any person

19   could go out with that email address information or with

20   that phone number and derive the same information publicly

21   from their own Google searches, is that correct?

22   A.    Google or other search engines or other research, yes.

23            MR. FLEISHER:  Your Honor, may I have a moment?

24            THE COURT:  Certainly.

25            (Pause in proceedings.)

1          MR. FLEISHER:  That's all I have, your Honor,

2    thank you.

3          THE COURT:  Thank you, Mr. Fleisher.  Mr. Gerace.

4          MR. GERACE:  Nothing, your Honor.  Thank you.

5          THE COURT:  Officer, you may step down.  Thank you

6    for your time, sir.

7          THE WITNESS:  Thank you.

8          THE COURT:  Mr. Gerace, any further witnesses from

9    the government?

10          MR. GERACE:  No, your Honor.

11          THE COURT:  All right.  Are you offering exhibits?

12          MR. GERACE:  Your Honor, the government would

13    offer Government's Exhibits A and B.

14          THE COURT:  Mr. Fleisher, any objections to

15    government's A and B for purposes of this hearing?

16          MR. GERACE:  No objection to either, your Honor.

17          THE COURT:  Do you rest your case at this point,

18    Mr. Gerace?

19          MR. GERACE:  Yes, your Honor.

20          THE COURT:  Mr. Fleisher, at this point any

21    witnesses to present or exhibits to introduce?

22          MR. FLEISHER:  Your Honor, may we approach the

23    Court for a sidebar?

24          THE COURT:  Yes.

25                        AT THE BENCH

1          THE COURT:  Yes, sir, Jim.

2          MR. FLEISHER:  Thank you, your Honor.  After

3   consultation with my client, it is my understanding that he

4   desires to testify for the limited purposes of this hearing.

5   I wanted to put on the record that it's against my advice.

6   I've attempted to advise him as best I can about that

7   decision but he wishes to testify nonetheless.

8          THE COURT:  It's his decision to make, Jim.  Have

9   you advised him that anything he says may be introduced at

10  trial?

11         MR. FLEISHER:  Yes, your Honor.

12         THE COURT:  He's aware of that?

13         MR. FLEISHER:  He's aware of that.  He's aware he

14  will be testifying under oath.  And I intend to limit the

15  inquiry pretty significantly as far as the factual confines

16  of what I expect he'll be testifying about.

17         THE COURT:  Dominick, obviously cross is limited

18  to the scope of the direct.

19         MR. GERACE:  Understood your Honor.

20         THE COURT:  Very good.  I'm ready to proceed.

21                      IN OPEN COURT

22         THE COURT:  Mr. Fleisher, I understand you have a

23  witness.

24         MR. FLEISHER:  Yes, your Honor.  At this time I

25  would call Mr. Almadaoji for the limited purpose of

1     testifying regarding this motion.

2          THE COURT:  Mr. Almadaoji, come on up if you

3     would, sir.

4                         NASER ALMADAOJI,

5               after having been first duly sworn,

6                     testified as follows:

7          THE COURT:  Mr. Almadaoji, good morning to you.

8          THE DEFENDANT:  Good morning, your Honor.

9          THE COURT:  Do you understand that you're not

10    required under the law to testify at this hearing or if we

11    go to trial at trial, do you understand that?

12         THE DEFENDANT:  I do, your Honor.

13         THE COURT:  Do you understand that anything you

14    say this morning may be used against you at a trial?

15         THE DEFENDANT:  I do.

16         THE COURT:  Has Mr. Fleisher, your attorney,

17    advised you of this?

18         THE DEFENDANT:  I do.  Yes.

19         THE COURT:  Is it your decision to take the

20    witness stand to testify in spite of what I've just told

21    you?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  Do you have any questions to ask of

24    me?

25         THE DEFENDANT:  No, your Honor.

1          THE COURT:  All right.  Proceed, Mr. Fleisher.

2    One moment, please, if you would.  Do you understand that

3    after Mr. Fleisher questions you, the government will have

4    the opportunity to question you as well?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Do you understand?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Proceed, if you would, Mr. Fleisher.

9                    DIRECT EXAMINATION

10   BY MR. FLEISHER:

11   Q.   Good morning, Mr. Almadaoji.

12   A.   Good morning, Mr. Fleisher.

13   Q.   You've had an opportunity to listen to the testimony of

14   Officer Tripoli, is that correct?

15   A.   Yes.

16   Q.   I'd like to ask you a few very brief questions about

17   your interactions with Officer Tripoli on February 24 of

18   2018, okay?

19   A.   Okay.

20   Q.   Can you recount for the Court your recollection of your

21   interactions first with Officer Nagy who did the baggage

22   check?

23   A.   Yes.  So after I got off the flight, I went through the

24   baggage checkpoint and Officer Nagy was there with another

25   officer, and they checked my baggage.  They asked where I

1   had been.  And I said Egypt and Jordan.

2        They asked me what purpose.  I said it was a vacation.

3        They asked me if I visited Iraq, Syria, Yemen or Libya.

4   I said no, I did not.

5        Officer Nagy opened up my bag and he seen two shemaghs

6   that I had.  And he asked me what these were.  And I said

7   they were traditional.

8        Officer Nagy then told me to take a seat and -- while

9   he went somewhere else.  He came back.  He told me to come

10  with him.  So I grabbed my luggage and I went with Officer

11  Nagy.

12       We met Officer Tripoli, and Officer Tripoli asked me if

13  I had a phone with me.  I said I did.

14       He said he wanted the phone and the passport.  So I

15  gave him -- well, I asked him what was -- what's his matter

16  for my phone.

17       So he handed me an electronic tear sheet.  And I asked

18  what is this thing.

19       So he pointed to me to read where it says if you refuse

20  to give your phone, it can be detained from you.  So I did

21  give him my phone number, and I did give him my password.

22  But I do not recall putting it on airplane mode myself.

23       Officer Tripoli then told me to take a seat, and it was

24  a place somewhere away from his booth, about 25 to 35 feet

25  away from his booth.  And he told me to take a seat while he

1    went and examined the phone.

2        I sat there about 20 to 30 minutes, and then he called

3    me back, he called me to his booth.  That's when he began to

4    question me.  And that questioning lasted for maybe an hour.

5        At the end of the questioning, he opened up my bag,

6    searched it.  He viewed the two Go Pro like cameras in my

7    bag.  He asked me about them.

8        I said I had purchased them for the trip but he never

9    examined them for any pictures or videos that were taken

10   with them.

11       Then he also again he seen my shemaghs.  He asked me

12   about them.  Again I told him they were traditional.

13   Q.   Is there anything else you'd like to testify about with

14   respect to your interactions with Officer Nagy or Officer

15   Tripoli that day?

16   A.   Yes.  I never verbally gave Officer Tripoli my phone

17   number, my email or my Snapchat account or any other social

18   media that I had.  He did ask me about my phone and why I

19   did not take pictures.  I told him that I was not someone

20   that was interested in taking pictures.

21            MR. FLEISHER:  No further questions, your Honor.

22            THE COURT:  All right.  Thank you.  Mr. Gerace.

23            MR. GERACE:  Thank you, your Honor.

24

25

```
1                          CROSS-EXAMINATION

2    BY MR. GERACE:

3    Q.   Good morning, Mr. Almadaoji.

4    A.   Good morning.

5    Q.   Mr. Almadaoji, you mentioned that you interacted with

6    Officer Nagy and another officer first, is that correct?

7    A.   Yeah.

8    Q.   They asked you the purpose of your trip, is that right?

9    A.   Yes.

10   Q.   You told them the purpose of your trip -- your trip was

11   to Egypt and Jordan, is that right?

12   A.   Yes.

13   Q.   You told them, you just testified, the purpose of your

14   trip was a vacation, is that right?

15   A.   Yes.

16   Q.   That was not true, was it?

17   A.   I don't understand the question.

18   Q.   You weren't in fact in Egypt and Jordan on vacation,

19   were you?

20   A.   I'm sorry, I don't understand the question.  I was on

21   vacation, what I told the agent.

22   Q.   Your testimony today is that you were being truthful

23   with Officer Nagy when you told him you were on vacation to

24   Egypt and Jordan?

25             THE DEFENDANT:  Your Honor, may I have a moment to
```

1    consult with my lawyer?

2         THE COURT:  Certainly.  Why not step down and go

3    over to counsel table.

4         (Pause in proceedings.)

5         THE COURT:  Have you had a chance to speak with

6    your lawyer, Mr. Almadaoji?

7         THE DEFENDANT:  Yes, your Honor, I did.

8         THE COURT:  All right.  Mr. Gerace.

9    Let's have the last question reread if that's your

10   wish, Mr. Gerace.

11        MR. GERACE:  Thank you, your Honor.  That's fine.

12        (Record read.)

13   BY MR. GERACE:

14   Q.   You may answer.

15   A.   No, I was not being truthful.

16   Q.   So you were lying to him at that point?

17   A.   Yes.

18   Q.   Office Nagy then took you over to Officer Tripoli, is

19   that correct?

20   A.   Yes.

21   Q.   Officer Tripoli engaged in about an hour or so,

22   hour-and-a-half interview of you?

23   A.   Yes.

24   Q.   Did you answer a bunch of questions from Officer

25   Tripoli?

1    A.    I did.

2    Q.    Did you tell Officer Tripoli that you have no family or

3    friends in Egypt and that you just wanted to visit Cairo?

4    A.    I told him that I did not have family in Egypt.  I

5    didn't mention anything about friends.

6    Q.    So that's accurate?

7    A.    Yeah.

8    Q.    I'm reading from his report.  I'd like to know if these

9    things are accurate from the report.  Okay?

10   A.    Okay.

11   Q.    He says you claimed you stayed at an airport (sic) in

12   New Egypt City and booked it once you got to the airport by

13   asking the taxi driver for recommendations, is that right?

14   A.    That's correct.

15   Q.    He said that you, when you were asked if you had

16   anything booked or planned other than just showing up to

17   these countries, you stated no, I was just winging

18   everything or no, I just winged everything, is that right?

19   A.    No but I did say that I did not have any previous plans

20   and bookings.

21   Q.    He said that you claimed that you paid approximately

22   $142 for three nights in New Egypt City, is that right?

23   A.    That's correct.

24   Q.    He said you stated that you travelled by yourself on

25   the entire trip and stated that you saw the Nile River and

1    just visited the city of Cairo, is that right?

2    A.   That's correct.

3    Q.   But that wasn't true.  You had met with people during

4    that trip, hadn't you?

5    A.   I did but I did not travel with them.

6    Q.   Fair enough.  You claim that the boat ride was

7    approximately 3 to 4 hours long from the southern peninsula

8    and then over to Jordan, is that right?

9    A.   That's correct.

10   Q.   Then you claim that you spent approximately three days

11   in Jordan?

12   A.   That's correct.

13   Q.   Did you tell him that you had family in Jordan but did

14   not visit them or even tell them that you were going to be

15   in the country?

16            MR. FLEISHER:  Your Honor, respectful objection.

17   I think this is beyond the scope of direct.

18            THE COURT:  I would sustain.

19            MR. GERACE:  Your Honor, if I may.  The direct

20   testimony was about the interaction with Officer Tripoli.

21   So I believe the circumstances of the interview of Officer

22   Tripoli and Mr. Almadaoji are not beyond the scope.

23            THE COURT:  I respect your opinion, sir.  I truly

24   do.  But in sustaining the objection, I certainly will allow

25   you to question anything to which he referred on direct but

1    I'm not going to let you go beyond the direct testimony.  I

2    don't think his testimony as to the interactions opens the

3    door, at least at this stage of the case, to everything that

4    might have been discussed.

5              MR. GERACE:  Understood, your Honor.  Thank you.

6    BY MR. GERACE:

7    Q.    Mr. Almadaoji, did you tell Officer Tripoli that you

8    liked the way shemaghs looked on fighters?

9    A.    No, I did not.

10    Q.    We mentioned earlier, you said you weren't being

11    truthful with Officer Nagy about the purpose of your trip

12    when you said it was a vacation, right?

13    A.    Correct.

14    Q.    Did you tell Officer Tripoli what the true purpose of

15    your trip over to Egypt and Jordan was?

16              MR. FLEISHER:  Objection, your Honor, beyond the

17    scope.

18              THE COURT:  I would overrule this.

19              THE WITNESS:  No, I did not.

20    BY MR. GERACE:

21    Q.    So you weren't truthful or completely truthful with

22    Officer Tripoli either, is that right?

23    A.    No.

24              MR. GERACE:  May I have a moment, your Honor?

25              THE COURT:  Certainly.

```
1              (Pause in proceedings.)

2    BY MR. GERACE:

3    Q.   Mr. Almadaoji, if the trip to Egypt and Jordan wasn't

4    for a vacation, what was it for?

5    A.   I had a friend in Egypt that I was visiting.

6    Q.   Did you have any plans to do anything with that friend

7    in Egypt?

8              MR. FLEISHER:  Objection, your Honor, beyond the

9    scope.

10             THE COURT:  I'll overrule.  I think this is

11   frankly a followup to the most recently asked question.

12             MR. FLEISHER:  Thank you, your Honor.  Could I

13   make a further point in support of the objection?

14             THE COURT:  Yes.  I'm sorry, sir.  I'm going to

15   ask you to unmask.

16             MR. FLEISHER:  I'd like to raise an additional

17   point with respect to the objection.  In the event that this

18   testimony is in fact admissible at trial, there are 404(a)

19   404(b) issues that might be raised at trial regarding this.

20   I would just like to note those for the record now to put it

21   on the record, your Honor.

22             THE COURT:  I understand.  Thank you, Mr.

23   Fleisher.  That statement does not affect the Court's ruling

24   but, Mr. Gerace, do you anticipate offering 404(a) and (b)

25   testimony?
```

1          MR. GERACE:  Your Honor, I think we can debate

2     whether or not the testimony would be 404(a) or 404(b).  At

3     this time I can't tell the Court.  I don't know what the

4     testimony is going to be.  I'm not sure whether or not we

5     would seek to introduce the statements at trial at this

6     point.

7          THE COURT:  Are you talking about this testimony

8     or are you talking about a witness's testimony on direct?

9          MR. GERACE:  Your Honor, I'm talking about the

10    testimony that Mr. Almadaoji is about to provide.

11         THE COURT:  All right.

12         MR. GERACE:  In response to my last question.

13         THE COURT:  I hear you.  The objection is

14    overruled.  Read the last question, if you would, back.

15         (Record read.)

16         THE WITNESS:  Your Honor, can I have a moment to

17    consult with my lawyer again?

18         THE COURT:  Certainly, sir.  Go ahead.

19         (Pause in proceedings.)

20         THE COURT:  Mr. Almadaoji, have you had the

21    opportunity to speak with your lawyer now for the second

22    time?

23         THE DEFENDANT:  Yes, your Honor, I did.

24         THE COURT:  All right.  Read the last question,

25    please.

1           (Record read.)

2           THE WITNESS:  Yes, that friend was facing a

3   deadline to be mandatorily enlisted in the Egyptian military

4   and he wanted a way out.

5   BY MR. GERACE:

6   Q.   Were you going to help him with that way out?

7   A.   Possibly.

8   Q.   How?

9   A.   He was planning to leave his hometown to go to Sinai

10  Peninsula.

11  Q.   What was in the Sinai Peninsula?

12  A.   I believe Wilayah Sina.

13  Q.   Is your understanding Wilayah Sina is ISIS in the Sinai

14  Peninsula?

15  A.   Yes.

16  Q.   You were going to go with him, weren't you?

17  A.   I do not recall that plan.

18  Q.   I'd like to remind you you're under oath, Mr.

19  Almadaoji.

20  A.   I understand.

21  Q.   Did you attempt to go to ISIS in the Sinai Peninsula

22  yourself on that trip?

23  A.   I did.

24           MR. GERACE:  One moment, your Honor.

25           (Pause in proceedings.)

1          MR. GERACE:  Thank you, your Honor.  No further

2    questions.

3          THE COURT:  Thank you, Mr. Gerace.  Mr. Fleisher,

4    redirect.

5          MR. FLEISHER:  No redirect, your Honor.

6          THE COURT:  You may step down, sir.  Thank you.

7       Mr. Fleisher, do you have any other witnesses at this

8    time for this hearing?

9          MR. FLEISHER:  No, your Honor, I do not.  The

10   defense would rest.

11         THE COURT:  All right.  Do you have any exhibits

12   to offer?  I believe there's an exhibit marked defense B but

13   I think that's already in the record if I'm not mistaken

14   through a memorandum you filed.  What is your wish?

15         MR. FLEISHER:  If the Court would consider the

16   memorandum and its attachments, we have no further exhibits

17   to introduce.

18         THE COURT:  Very good.  Do you rest your

19   presentation?

20         MR. FLEISHER:  I do, your Honor.

21         THE COURT:  Mr. Gerace, any rebuttal?

22         MR. GERACE:  Nothing, your Honor.  Thank you.

23         THE COURT:  All right.  We have some loose ends

24   that I'd like to discuss at this point.  First of all, you

25   have both briefed the -- give me a moment.  Based on this

1　　hearing, Mr. Gerace, do you wish to further respond to the

2　　Defendant's motion or supplemental motion to suppress?

3　　　　　　MR. GERACE:  Your Honor, I think the government

4　　would like an opportunity to file a response given that it

5　　seems the defense has raised a credibility matter with

6　　respect to Officer Tripoli.

7　　　　　　THE COURT:  All right.  Assuming, how much time --

8　　will you need subsequent to the filing of a transcript and

9　　do you need a transcript?

10　　　　　　MR. GERACE:  Your Honor, we would like a

11　　transcript, but I think we could get a response in, within a

12　　week of receiving those transcripts.

13　　　　　　THE COURT:  All right.  How about 10 days from

14　　now -- thank you -- which will be, give or take, the 6th or

15　　7th of October, a memorandum 7 days after that.  Mr. Gerace,

16　　is that acceptable?

17　　　　　　MR. GERACE:  It is, your Honor.  Thank you.

18　　　　　　THE COURT:  Mr. Fleisher, I'm thinking in terms of

19　　a simultaneous memorandum on the same schedule.  I first

20　　need to ask if you wish a transcript.  Then if the schedule

21　　is sufficient.

22　　　　　　MR. FLEISHER:  Yes, your Honor, I would like a

23　　transcript.  That schedule is fine.  Simultaneous briefing

24　　is perfect.

25　　　　　　THE COURT:  Very good.  Thank you.  The government

1    has asked for a *Daubert* hearing on Dr. Vidino's anticipated

2    testimony.  I take it by *a hearing*, you mean to have the

3    doctor either in person or by video to be put through his

4    paces on direct examination, is that accurate?

5             MR. GERACE:  Your Honor, the government is not

6    asking for the *Daubert* hearing.  Dr. Vidino would be our

7    witness.  Defense has asked for that.  We'd briefed the

8    issue and argued in our brief that we don't believe that a

9    hearing is necessary.

10            THE COURT:  All right.  Am I correct that it was

11   your -- I'm sorry.  I simply got a contrary meaning from the

12   caption.  That certainly is no fault of yours, Mr. Gerace.

13            MR. GERACE:  I apologize, your Honor.  Thank you.

14            THE COURT:  Mr. Fleisher, do you wish a *Daubert*

15   hearing at which Dr. Vidino will testify either in person or

16   by video?

17            MR. FLEISHER:  Your Honor, if I could consult with

18   Mr. Almadaoji and perhaps advise the Court of whether that

19   hearing would be requested perhaps in two days.

20            THE COURT:  Absolutely.  If we would set a

21   telephone conference for late Wednesday, would that be

22   sufficient?

23            MR. FLEISHER:  Yes, your Honor.  Thank you.

24            THE COURT:  Tish, how can you help us?

25            THE COURTROOM DEPUTY CLERK:  Yes, sir.

1          MR. GERACE:  Your Honor, while we're waiting if I

2    may.

3          THE COURT:  Please.

4          MR. GERACE:  I just want to let the Court know

5    that Dr. Vidino's schedule is one of the matters that caused

6    us to have to move this trial to November 1st.  He is not

7    currently in the country.  So getting him here for a *Daubert*

8    hearing may prove difficult from a practical standpoint.  I

9    just wanted to let the Court know that in advance as we're

10   gathering dates and things of that nature.

11         THE COURT:  I know that -- I understand what you

12   said.  I know you'll do your best to have him available.  I

13   am more than happy to take his testimony by video

14   conferencing.  We have a five-week delay in the trial so the

15   hearing does not have to be this week.  And I'm willing to

16   have briefing on a very, very tight schedule with minimal

17   briefing because I think I know the law to apply to whatever

18   his testimony is.  So all I ask is that you do your best,

19   the best you can which you always do.

20         MR. GERACE:  Thank you, Judge.

21         THE COURT:  Thank you.

22         Telephone conference Wednesday the 29th at 4:30.

23   Mr. Gerace and your colleague.

24         MR. GERACE:  That's good for the government, your

25   Honor.

1          THE COURT:  Mr. Sher?

2          MR. SHER:  Yes, your Honor, thank you, that works.

3          THE COURT:  Thank you.  Mr. Fleisher.

4          MR. FLEISHER:  Yes, your Honor, that works.

5          THE COURT:  That will be for the purpose of

6     discussing whether a hearing is necessary and the logistics

7     of same and setting a date for the hearing if deemed

8     necessary and of course anything else that counsel wish to

9     discuss.  Mr. Gerace, any loose ends at this point?

10          MR. GERACE:  Your Honor, the only thing the

11     government can think of is, there is the second motion in

12     limine which is kind of tied to the first in a sense.  If

13     the Court's prerogative is to hear them both at the same

14     time, I understand.  I just wanted to raise that.

15          THE COURT:  What was that issue?

16          MR. GERACE:  That issue was motion in limine to

17     exclude testimony about violence.

18          THE COURT:  Would that come from Dr. Vidino or

19     from another witness?

20          MR. GERACE:  Partly from Dr. Vidino.  Also some

21     exhibits that we've outlined that depicts acts of violence.

22          THE COURT:  Obviously if a *Daubert* hearing is

23     needed, he'll cover that I'll call it allied motion and if a

24     *Daubert* hearing is deemed not necessary by Defendant, we'll

25     have a hearing on the related motion.  We can discuss all of

1    this on Wednesday.

2              MR. GERACE:  Thank you, your Honor.

3              THE COURT:  You're welcome.  Anything else, sir?

4              MR. GERACE:  No, your Honor, thank you.

5              THE COURT:  Mr. Fleisher, any loose ends at this

6    point?

7              MR. FLEISHER:  No, your Honor.  Thank you.

8              THE COURT:  All right.  I thank everyone for their

9    courtesies.  Mr. Gerace, anything in addition based on what

10   you and co-counsel have just discussed?

11             MR. GERACE:  No, your Honor, I'm sorry.

12             THE COURT:  Nothing to be sorry about.  We are in

13   recess.

14             (Proceedings concluded at 12:08 p.m.)

15                    - - -

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2          I, Debra Lynn Futrell, Federal Official Court

3     Reporter, in and for the United States District Court for

4     the Southern District of Ohio, Western Division at Dayton,

5     do hereby certify that the foregoing pages constitute a true

6     and correct transcript of the stenographically reported

7     proceedings held in the above-entitled matter, on the date

8     indicated, to the best of my ability to hear and discern

9     speakers on the speaker phone, transcribed by me.

10

11     s/Debra Lynn Futrell,

12     Debra Lynn Futrell
       Federal Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25