IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:18CR158 |
| v. | : | UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S |
| NASER ALMADAOJI, | : | SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE |
| Defendant. | : | |

The United States hereby submits its post-hearing response in opposition to Defendant

Naser Almadaoji's Supplemental Motion to Suppress Evidence Pursuant to the Fourth

Amendment to the United States Constitution (Doc. No. 61). The supplemental motion should

be denied because: (1) the United States does not intend to use at trial any information observed

or obtained from the manual search of Almadaoji's cellular telephone conducted at Chicago

O'Hare International Airport on February 24, 2018, nor did the United States use any such

information to obtain additional evidence against Almadaoji; (2) in any event, the manual search

of Almadaoji's cellular telephone—and the attendant written recording of information related to

that phone—was proper under the border search exception to the Fourth Amendment's warrant

and probable cause requirements; and (3) in the alternative, the good-faith doctrine bars the

suppression of any evidence or derivative evidence obtained from the manual search.

## BACKGROUND

On February 24, 2018, Naser Almadaoji arrived at Chicago O'Hare International Airport

on a flight from Frankfurt, Germany. (Transcript of Proceedings, September 27, 2021, Doc. No.

74, at PAGEID# 558). Almadaoji's arrival at O'Hare marked his return to the United States after

an approximately eight-day trip to Egypt and Jordan. (*See* Gov't Ex. A at 1).

As part of the customs process for passengers entering the United States from a foreign country, Almadaoji interacted with United States Customs and Border Protection (CBP) Officer Nagy.  (*Id.* PAGEID# 558).  After speaking with Almadaoji, Officer Nagy selected Almadaoji for secondary questioning and screening based on concerns regarding Almadaoji's behavior, his inability to answer certain questions, and in light of the countries to which Almadaoji had traveled.  (*Id*. PAGEID# 573, 598).

As it turns out, Officer Nagy's concerns regarding Almadaoji were justified.  While Almadaoji had told Officer Nagy that he had been in Egypt and Jordan for vacation, Almadaoji was not telling the truth.  (*Id*. PAGEID# 622, 624).  In fact, Almadaoji was returning from Egypt and Jordan after attempting to join ISIS's affiliate in the Sinai Peninsula, Wilayat Sinai—a designated foreign terrorist organization.  (*Id*. PAGEID# 631).[1]

To effect the secondary screening, Officer Nagy escorted Almadaoji to Officer Tripoli, who was located in a separate area designated for such screenings.  (*Id.* PAGEID# 558).  Officer Tripoli, a 13-year veteran of CBP, was assigned to a unit focused on terrorism and had conducted thousands of secondary screenings as part of his duties.  (*Id.* PAGEID# 554-56).  Officer Nagy informed Officer Tripoli that he (Nagy) had conducted an examination of Almadaoji's baggage, and that Almadaoji was in possession of four shemagh-style head wraps.  (*Id*. PAGEID# 575).[2]

---

[1] In addition to admitting during the suppression hearing to attempting to join Wilayat Sinai during his trip to Egypt and Jordan, Almadaoji also admitted the same to an FBI confidential human source during Telegram communications that took place in August 2018.

[2] Officer Tripoli testified that Officer Nagy made no indication that he (Nagy) had also conducted a search of Almadaoji's cellular telephone—something that Officer Nagy typically would have told Officer Tripoli had such a search occurred.  (*Id.* PAGEID# 574, 594).  When Officer Nagy escorted Almadaoji to Officer Tripoli, Almadaoji was in possession of his own cellular telephone.  (*Id.* PAGEID# 595).  And Almadaoji did not claim during his direct examination that Officer Nagy took or searched his phone.  (*Id.* PAGEID# 622).

The secondary screening area at O'Hare features standard immigration booths located in a separate area away from the travelling public. (*Id.* PAGEID# 558). The booths contain computers that are not capable of performing a forensic search of a cellular telephone. (*Id.* PAGEID# 584). During his interaction with Almadaoji, Officer Tripoli sat in the booth, while Almadaoji stood. (*Id*. PAGEID# 576).[3] Officer Tripoli's interview of Almadaoji began at 2:05 p.m. and ended at 3:56 p.m. (*Id*. PAGEID# 560). Officer Tripoli documented his interaction with Almadaoji in a report that Officer Tripoli was required to complete as part of the screening process. (*Id.* PAGEID# 560; Gov't Ex. A). Officer Tripoli drafted the report on the computer located in the booth and entered information into the report while interviewing Almadaoji. (*Id.* PAGEID# 576). Officer Tripoli gathered the information in the report throughout the interview, and the report does not necessarily list information in the chronological order in which it was obtained. (*Id*. PAGEID# 561, 578, 589, 595).

Officer Tripoli began the interview by confirming the information that Almadaoji had provided on his customs declaration form. (*Id*. PAGEID# 559). According to port policy, Officer Tripoli also was required to elicit certain information from Almadaoji, including his telephone number, address, city and country of birth, places or persons visited, and purpose of his trip. (*Id*. PAGEID# 561). These required categories of information are listed numerically on the first two pages of Officer Tripoli's report and are numbered one through fourteen. (*Id.*; Gov't Ex. A at 1-2).

---

[3] There was a period of time during which Almadaoji sat five to ten feet away from Officer Tripoli during the interview while Officer Tripoli was manually reviewing Almadaoji's cellular telephone. (Doc. No. 74, PAGEID# 593).

In accordance with port requirements, Officer Tripoli verbally asked Almadaoji to provide his telephone number, and Almadaoji verbally stated that his telephone number was 937-969-0509. (*Id*. PAGEID# 561, 562).[4] Officer Tripoli documented Almadaoji's telephone number in two places in his report. (*Id*. PAGEID# 561, 595; Exhibit A, at 2, 4). Officer Tripoli customarily verbally asks passengers for their telephone number, and had Almadaoji refused to verbally provide a telephone number, Officer Tripoli would have documented that fact in his report. (*Id*. PAGEID# 562).

In addition to a telephone number, Officer Tripoli also customarily verbally asks passengers for an email address. (*Id*. PAGEID# 563). During his interview of Almadaoji, Officer Tripoli verbally asked Almadaoji for an email address, and Almadaoji verbally stated that his email address was nasermunshid16@gmail.com. (*Id.* PAGEID# 562-63). Officer Tripoli documented Almadaoji's email address in his report. (*Id*. PAGEID# 563). Had Almadaoji refused to verbally provide his email address to Officer Tripoli, Officer Tripoli would have documented that fact in his report. (*Id*).[5]

During secondary screenings, Officer Tripoli also typically asks passengers for information regarding any social media accounts. (*Id*. PAGEID# 578). In response to Officer

---

[4] Almadaoji claimed during direct examination that he did not verbally provide his telephone number and email address to Officer Tripoli. As discussed further below, there are numerous reasons to credit Officer Tripoli's testimony over Almadaoji's, not the least of which is Almadaoji's admissions that he lied to CBP officers about the purpose of his trip to Egypt and Jordan.

[5] Officer Tripoli did not observe an email application on Almadaoji's phone and, had he seen additional email addresses in the phone, would have listed those in his report. (*Id*. PAGEID# 596).

4

Tripoli's inquiry in this regard, Almadaoji verbally provided information regarding a Snapchat account. (*Id*. PAGEID# 578-79; Gov't Ex. A at 5).[6]

Approximately six minutes into the interview, Officer Tripoli obtained Almadaoji's cellular telephone to conduct a manual examination. (*Id*. PAGEID# 564). Officer Tripoli decided to manually examine Almadaoji's telephone at that point based on Almadaoji's inability to articulate details about his trip, concerns about the areas to which Almadaoji had traveled, and concerns about the lack of photographs in cameras that Almadaoji had in his baggage. (*Id*. PAGEID# 564-65, 587).

When Officer Tripoli obtained Almadaoji's phone, he provided Almadaoji with an electronic tear sheet. (*Id.* PAGEID# 566). The electronic tear sheet is a standard CBP form that explains the process for searching an electronic device and CBP's authority for doing so. (*Id.* PAGEID# 566, 588). When asked for his phone, Almadaoji voluntarily unlocked the phone, placed it in airplane mode, and provided it to Officer Tripoli. (*Id*.).[7] While the electronic tear sheet advises that a cellular telephone can be detained by CBP for examination if a passenger refuses to unlock the phone voluntarily, Officer Tripoli did not verbally advise Almadaoji of the same because Almadaoji voluntarily unlocked his phone. (*Id*. PAGEID# 592).

Officer Tripoli manually examined Almadaoji's phone "off and on" throughout the interview. (*Id*. PAGEID# 567). At no time did Officer Tripoli take the phone away from the immigration booth during the examination. (*Id*. PAGEID# 584). Officer Tripoli's search of the

---

[6] Despite the presence of other social media applications on his cellular telephone, as discussed below, Almadaoji informed Officer Tripoli only of the Snapchat account. (*Id*. PAGEID# 580).

[7] Officer Tripoli testified that CBP's directive for border searches of electronic devices provides for devices to be placed in airplane mode so that the CBP officer cannot access information stored on a cloud or otherwise remotely. (*Id*. PAGEID# 582-83).

5

phone was a "basic" or "manual" examination.  (*Id*.)  It consisted of a "casual browsing" during which Officer Tripoli thumbed or scrolled through the phone.  (*Id*.).  At no time did Officer Tripoli hook the phone up to forensic evaluation equipment, download the contents of the phone, or generate any kind of forensic report.  (*Id*.).  Officer Tripoli documented what he observed (or did not observe) in Almadaoji's phone on his report.  (*Id*. PAGEID# 567-68).  Officer Tripoli would have documented anything of note regarding the phone in his report, and his report is the only place where information that he observed regarding the phone was recorded.  (*Id*. PAGEID# 568).

When manually scrolling through Almadaoji's phone, Officer Tripoli noticed that there were not many photographs on the phone, except for two or three images of Almadaoji's itinerary.  (*Id*.; Exhibit A at 4).  Officer Tripoli also noted the presence of three applications on Almadaoji's phone—Text Now App, Hadith App, and Kik App.  (*Id*.; Exhibit A at 5).[8]  Officer Tripoli did not observe the Snapchat application on Almadaoji's phone, and his report does not list Snapchat the under "Apps on his phone" section of the report.  (*Id*. PAGEID# 569, 579; Exhibit A at 5).  Had Officer Tripoli observed the Snapchat application on Almadaoji's phone, he would have documented that in his report. (*Id*. PAGEID# 569).

During the interview, Almadaoji made several statements that concerned Officer Tripoli. (PAGEID# 569, 599).  As detailed in the report, Almadaoji claimed to have traveled by himself to Jordan and Egypt and that he returned after a taxi driver stole his backpack and $3,000. Almadaoji claimed that he had nothing booked or planned in Egypt or Jordan, and traveled to those places because they looked nice.  Almadaoji stated that he traveled alone the entire time

---

[8] Officer Tripoli recorded user information for the Kik application, but did not record user information from the other two applications because some applications restrict access to that sort of information when a device is placed in airplane mode.  (*Id*. PAGEID# 598).

and paid cash for everything. Almadaoji referenced U.S. airstrikes and the use of drones that "slaughtered Muslims" and stated that the United States needed to leave the Middle East. Almadaoji further stated that he thought about joining the Peshmergan military in northern Iraq because it was the "real force[ ] in Iraq to stop ISIS, not U.S." Almadaoji stated ISIS was "bad for killing other Muslims," but most Muslims killed by ISIS were "Shiites," and "Shiites were their [Sunnis] natural adversaries." Almadaoji explained Shiites "didn't follow true Islam" and the people of Iraq were no freer now than before ISIS invaded Iraq. (Gov't Ex. A at 2-4). Almadaoji did not inform Officer Tripoli that the true purpose of his trip to Egypt and Jordan was to join ISIS in the Sinai Peninsula. (Doc. No. 74 at PAGEID# 628).

Upon conducting an examination of Almadaoji's bag, Officer Tripoli observed four shemagh-style head wraps. (*Id*. PAGEID# 596-97; Gov't Ex. A at 4). When Officer Tripoli asked about the shemaghs, Almadaoji responded that he liked the way they looked on "fighters." (*Id*. PAGEID# 569; Gov't Ex. A at 4). Officer Tripoli asked Almadaoji if he had seen any fighters while overseas, and Almadaoji answered, "no not really," but stated he observed "fighters" wearing shemaghs online (Gov't Ex. A at 4).

Following the interview, Almadaoji's cellular telephone was returned to him and Almadaoji proceeded through customs. (Doc. No. 74 at PAGEID#569). Officer Tripoli contacted FBI personnel regarding his interaction with Almadaoji and forwarded his report to the FBI. (*Id*. PAGEID# 570). Aside from the information contained in his report, Officer Tripoli did not provide any other information about the contents of Almadaoji's phone to the FBI. (*Id.*).

Based on Officer Tripoli's referral, the FBI's Joint Terrorism Task Force in Dayton opened an investigation regarding Almadaoji in March of 2019. (*Id*. PAGEID# 601-602, 604). The FBI conducted open-source queries using the phone number (937-969-0509) and email

7

address (nasermunshid16@gmail.com) that Almadaoji had verbally provided to Officer Tripoli. (*Id*. PAGEID# 607).[9]  These open-source checks consisted of searching publicly-available information for social media or internet accounts that were connected to the telephone number or email address that Almadaoji verbally provided to Officer Tripoli.  (*Id*. PAGEID# 605).

While conducting open-source checks for Almadaoji's phone number, the FBI learned for the first time that Almadaoji's phone number was linked to an account on Telegram with a username of AbuMuhammad16.  (*Id*. PAGEID# 609-11; Gov't Ex. B).[10]  After taking subsequent investigative steps through the use of confidential human sources and an undercover agent, the FBI arranged, through Telegram, for an undercover agent to meet with the user of this Telegram account.  (*Id*. PAGEID# 612).  Almadaoji was the person who showed up to the meetings. (*Id.*)

The FBI's open-source checks for the two email accounts associated with Almadaoji revealed connections to Google, Skype, Soundcloud, Tango, and Tumblr accounts.  (*Id*. PAGEID# 610).  The FBI issued multiple subpoenas based on these connections and based on other open source inquires.  (*Id.* PAGEID# 610-11).  Aside from the information contained in Officer Tripoli's report, the FBI did not receive any other information from CBP about Officer Tripoli's manual examination of Almadaoji's phone.  (*Id*. PAGEID# 603).  None of the subpoenas issued by FBI resulted from information obtained from the manual search of Almadaoji's phone. (*Id*. PAGEID# 614).

---

[9] The FBI also conducted an open-source query for a second email address linked to Almadaoji. The FBI identified that second email address after sending a grand jury to subpoena to Google seeking subscriber information for nasermunshid16@gmail.com.  The second email address, abubadraliraqi@gmail.com, was listed in the information Google provided as the recovery email address for nasermunshid16@gmail.com.  (*Id*. PAGEID# 607-08).

[10] Later in the investigation, the FBI learned that the username for this Telegram account was changed to AbuMuhammad19.  (*Id*. PAGEID# 611).

**ARGUMENT**

The Court should deny Almadaoji's supplemental motion to suppress because the United

States does not intend to use at trial any information that CBP observed or obtained from the

manual search of Almadaoji's cellular telephone on February 24, 2018; nor did the United States

use information observed or obtained from Almadaoji's cellular telephone on February 24, 2018,

to obtain other evidence against him.  In any event, the manual search of Almadaoji's cellular

telephone was proper under the border search exception to the Fourth Amendment's warrant and

probable cause requirements.  Alternatively, the good-faith doctrine bars the suppression of any

evidence or derivative evidence obtained as a result of the manual search.

I.    **The United States Does Not Intend to Use at Trial Any Information Obtained
      From Almadaoji's Cellular Telephone on February 24, 2018, and Did Not Use
      Such Information to Obtain Other Evidence Against Almadaoji.**

Almadaoji's supplemental motion to suppress should be denied because the manual

search of Almadaoji's phone yielded no information that the United States either intends to use

at trial or used to obtain additional evidence against Almadaoji.[11]

While Almadaoji suggests in his supplemental motion that Officer Tripoli's manual

examination of Almadaoji's cellular telephone is the source evidence that the government will

introduce against him at trial, that suggestion has no basis in fact.  As Officer Tripoli repeatedly

and consistently testified on direct and cross-examination, Almadaoji verbally provided his

telephone number and email address to Officer Tripoli during the secondary interview.  And as

FBI TFO Kyle Metz testified, shortly after opening its investigation into Almadaoji, the FBI used

---

[11] To be clear, Almadaoji was also in possession of the same cellular telephone upon his arrest at
the John Glenn Columbus International Airport on October 24, 2018.  Following the arrest, the
FBI obtained a federal search warrant to search the contents of the cellular telephone.  The
United States does intend to introduce at trial evidence obtained pursuant to that search warrant.

9

that phone number and email address to conduct open-source queries of publicly-available information. Those open-source queries led the FBI to identify, for the first time, a Telegram account belonging to Almadaoji, as well other social media and internet accounts linked to Almadaoji's email address. The FBI then engaged Almadaoji on Telegram using confidential human sources and an undercover agent, and obtained grand jury subpoenas to investigate multiple social media accounts linked to Almadaoji. These social media accounts were identified through open-source queries using Almadaoji's email addresses and by simply googling Almadaoji's name. None of the subpoenas issued by the FBI were the result of information that was observed on Almadaoji's cellular telephone.

Indeed, Almadaoji fails to specifically identify even one piece of evidence that he believes was unlawfully derived from the manual search of his phone. The speculative claims that he makes in his supplemental motion regarding the source of the government's evidence have been debunked fully by testimony at the suppression hearing. For example, Almadaoji highlights a portion of an FBI report that refers to the identification of a YouTube account and a Soundcloud account, asserting that "[i]t is likely that the CBP extracted and recorded this data from Mr. Almadaoji's phone." (Doc. No. 61 at 4). But, as TFO Metz testified, the YouTube and Soundcloud accounts referenced in the FBI report were identified when agents googled Almadaoji's name. (Doc. No. 74 at PAGEID# 613). Despite his best efforts, Almadaoji simply cannot escape the reality that the FBI started its case based on information that he provided verbally to Officer Tripoli, not based on information observed on his phone.

And because Almadaoji cannot argue that CBP somehow exceeded the bounds of its authority in obtaining his telephone number and email address verbally during the secondary interview, *e.g.*, *United States v. Ozuna*, 170 F.3d 654, 658 (6th Cir. 1999) ("Every day thousands

of travelers enter this country and each is detained until a search has been made or his answers to questions have convinced the customs agent that no search is necessary"), he attempts to cast doubt on the truth of Officer Tripoli's testimony. In support of that effort, Almadaoji testified during the suppression hearing that he did not provide his telephone number and email address verbally to Officer Tripoli. There are several reasons to credit Officer Tripoli's testimony in this regard, and more than one reason to disregard Almadaoji's testimony.

To begin, Officer Tripoli's testimony was consistent throughout the suppression hearing. At no time did he waver from his assertion that the phone number and email address were obtained verbally, and he also verified during cross-examination that he had independent recollection of these events. Officer Tripoli's testimony was internally corroborative. He testified that he routinely asks passengers verbally for telephone numbers, email addresses, and other social media information. In fact, Officer Tripoli is required under port policy to obtain a telephone number as one of the fourteen categories of information documented in his report. And had Almadaoji refused to provide such routine information, Officer Tripoli would have documented that fact.

Further, Officer Tripoli's testimony is corroborated by the format and contents of his report. Officer Tripoli testified that, in addition to Almadaoji's phone number and email address, he also obtained Snapchat information verbally from Almadaoji. That Snapchat information is listed in the report, in summary fashion, together with Almadaoji's phone number, email address, and residential address. All of this information is located above—and not under—the portion of the report where Officer Tripoli documented "Apps on his phone." Conspicuously missing from the list of "Apps on his phone" is the Snapchat application and an email application. Officer Tripoli testified that had the Snapchat application appeared on Almadaoji's phone, Officer

11

Tripoli would have documented that in the "Apps on his phone" portion of the report. Officer Tripoli also testified that he did not see an email application on Almadaoji's phone and would have documented such an application if he had seen it. Accordingly, the fact that the Snapchat and email information is listed in summary fashion on the report with Almadaoji's telephone number and residential address, and the fact that neither the Snapchat application nor an email application is listed under the "Apps on his phone" section of the report, strongly corroborate Officer Tripoli's testimony that Almadaoji's email address and Snapchat information were obtained from Almadaoji verbally, and not from the search of Almadaoji's phone.

Almadaoji's testimony, on the other hand, is wholly lacking in credibility. Inasmuch as Officer Tripoli's testimony is corroborated by his report, Almadaoji's testimony is contradicted by that report. For example, Almadaoji expects the Court to believe that he did not provide his telephone number verbally to Officer Tripoli when that very piece of information is part of fourteen categories of information that Officer Tripoli was required to collect as part of port policy. Likewise, Almadaoji's testimony that he did not provide his email address or Snapchat information verbally to Officer Tripoli is contradicted by the report's layout, as discussed above. During cross-examination, Almadaoji affirmed the truthfulness of several aspects of Officer Tripoli's report. Even so, he now expects the Court to conclude that Officer Tripoli's is not correct about the one issue that Almadaoji hopes will result in the suppression of evidence.

More to the point, there is no reason for the Court to believe Almadaoji's self-serving testimony given his demonstrated proclivity for not telling the truth. Almadaoji admitted on the stand during cross-examination that he lied to Officer Nagy about the purpose of his trip to Egypt and Jordan, and also that he did not tell the truth to Officer Tripoli about the purpose of that trip. Almadaoji was not returning from a vacation, as he claimed, but rather from an attempt to join

12

ISIS in the Sinai Peninsula.  To avoid being held accountable for that crime, Almadaoji lied to the officers charged with protecting the borders of this country.  There is no reason to believe he would not do the same to escape accountability for the crimes charged here.

In sum, despite Almadaoji's unsupported speculation, the United States did not use information from the manual search of Almadaoji's phone on February 24, 2018, to obtain additional evidence against Almadaoji.  Further, the United States does not intend to use at trial information observed or obtained from the phone on February 24, 2018.  Almadaoji's motion, accordingly, should be denied.

## II.     The Manual Search of Almadaoji's Cellular Telephone Was Permissible Under the Border Search Exception.

Almadaoji's motion to suppress also should be denied because the manual search of the cellular telephone and the written recording of information regarding the phone were permissible under the border search exception to the Fourth Amendment's warrant and probable cause requirements.

The government's interest in preventing the entry of "unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).  For this reason, the government has "plenary authority to conduct routine searches and seizures at the border, without probable cause or warrant . . . ." *Id.* at 153.  Under this so-called "border search exception" to the Fourth Amendment's probable cause and warrant requirements, "searches of people and their property at the borders are per se reasonable, meaning that they typically do not require a warrant, probable cause, or even reasonable suspicion." *United States v. Stewart*, 729 F.3d 517, 524 (6th Cir. 2013); *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant.").  This border search authority

13

extends to "functional equivalents" of the border, including airports where international flights land. *Stewart*, 729 F.3d at 524.

Pursuant to the principles discussed above, courts have consistently held that border officials may conduct manual searches of laptops and cellular phones without reasonable suspicion. *Stewart*, 729 F.3d at 525; *United States v. Cano*, 934 F.3d 1002, 1007 (9th Cir. 2019) ("manual cell phone searches may be conducted by border officials without reasonable suspicion"); *United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018); *Alasaad v. Mayorkas*, 988 F.3d 8, 19 (1st Cir. 2021). This is so because manual searches of electronic devices are considered routine in nature and far less intrusive than "forensic" searches. *See Stewart*, 729 F.3d at 525; *Cano*, 934 F.3d at 1007, 1014-16 (distinguishing manual searches from more intrusive forensic searches). A manual search generally consists of scrolling through an electronic device to view its contents, *e.g.*, *Stewart*, 729 F.3d at 521 (characterizing a search as "non-forensic" where the officer previewed the contents of a laptop while scrolling through it), while a forensic search involves the use of software to exhaustively analyze the contents of a device, potentially revealing incriminating evidence even in the device's unallocated space. *See United States v. Cotterman*, 709 F.3d 952, 967 (9th Cir. 2013) (describing a forensic search as "essentially a computer strip search").[12]

---

[12] Based on the differences between manual and forensic searches, some courts have held that forensic searches of electronic devices at the border require some particularized suspicion of criminal activity. *See Cano*, 934 F.3d at 1007; *United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018). At least one court, however, has held that even a forensic search can be conducted at the border without suspicion. *Touset*, 890 F.3d at 1233-1238 ("The Supreme Court has never required reasonable suspicion for a search of property at the border, however non-routine and intrusive, and neither have we."). As discussed herein, the search of Almadaoji's cellular telephone clearly was manual, and therefore the Court need not address this issue.

14

Here, it is undisputed that the search of Almadaoji's cellular telephone occurred after he had first arrived in the United States at Chicago O'Hare International Airport on an international flight from Germany. O'Hare was therefore the "functional equivalent" of the border to which the border-search authority extends. *See United States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002) ("O'Hare Airport is an international gateway into the United States, and incoming passengers from international ports are subject to border searches because the airport is the functional equivalent of an international border."). For the reasons stated below, the search of Almadaoji's cellular telephone, and the attendant written recording of information observed about the phone, was proper under the border search exception.

**A. The search of Almadaoji's cellular telephone was a routine manual examination that did not require reasonable suspicion.**

To begin, the search of Almadaoji's cellular telephone at O'Hare by Officer Tripoli was a routine manual examination, and thus required no reasonable suspicion. In searching Almadaoji's cellular telephone, Officer Tripoli manually examined the phone, scrolling through its contents. He did not use special software or other more intrusive means to examine the contents of the phone, and no forensic download or report was generated. Consequently, this case clearly features the "commonsense differentiation" between a manual review of an electronic device and a more intrusive forensic examination involving the "application of computer software." *See Cotterman*, 709 F.3d at 967 (distinguish between manual reviews and forensic examinations).

While Almadaoji attempts to cast the search as "more than . . . a cursory examination," (Doc. No. 61 at 4), that assertion is unfounded. Officer Tripoli noted in his report that his search of the phone revealed a few applications (Text Now, Hadith, and Kik) and a few photos. In fact, most of the information obtained by Officer Tripoli and recorded in his report was obtained

15

during the interview of Almadaoji, not the search of the cellular telephone. But even if all of the information about Almadaoji in Tripoli's report had come from the search of the phone, that still would not alter the character of the search. No computer software was used to conduct the search. Further, the quantity of information reflected in Officer Tripoli's report is consistent with a manual examination and pales in comparison to the trove of data that can be obtained through a forensic analysis. *Cf. Kolsuz*, 890 F.3d at 139 (describing a forensic search using Cellebrite Physical Analyzer, which involved an advanced logical extraction that yielded a 896-page report).

Additionally, the duration of Tripoli's interview of Almadaoji has no bearing on the determination of whether the search of the phone should be considered other than routine. Officer Tripoli's interaction with Almadaoji lasted approximately 1 hour and 50 minutes, and he manually searched Almadaoji's phone intermittently throughout the interview. The duration of the interview was reasonable in light of Almadaoji's answers to Tripoli's questions and the presence of shemaghs in Almadaoji's luggage. The duration of the interview, moreover, did not alter the routine character of the search. On this point, *United States v. Stewart* is instructive. There, the defendant arrived at the Detroit Metropolitan Airport on a plane from Japan with two laptop computers. 729 F.3d at 520. The defendant was selected for secondary inspection after giving a CBP officer potentially suspicious responses to questions. *Id.* CBP attempted to manually search one of the laptops, but was not able to conduct the search because the battery was dead and required a foreign power cord converter. *Id.* 520-21. After CBP manually searched the defendant's second laptop and found evidence of child pornography, they detained both laptops and told the defendant that he was free to leave. *Id.* at 521. CBP transported both laptops approximately 20 miles away and manually searched them the next day. *Id.* The

16

defendant argued that the delay and distance associated with the warrantless manual searches of his laptops exceeded the bounds of the border-search exception,[13] but the court rejected the argument. The court held that the fact that the laptop was transported beyond the border and examined one day after the initial seizure did not alter the routine nature of the search. *Id*. 525-26.

The same conclusion holds here. That Tripoli conducted the manual search of the phone intermittently over the course of the 1-hour and 50-minute interaction with Almadaoji did not transform the manual search into something other than routine. And because the search of Almadaoji's cellphone was routine, no particularized suspicion was required.

### B. The CBP officer lawfully obtained information from Almadaoji's cellular telephone that constituted potential evidence of a transnational crime.

Not only could Officer Tripoli manually search Almadaoji's cellular telephone without any particularized suspicion, but he could also lawfully record from the phone potential evidence of transnational crimes—including the crime of providing material support to a foreign terrorist organization. Additionally, the information that Officer Tripoli recorded in writing here—applications observed on the phone and the presence of few photographs—constitutes such potential evidence.

Based on the Ninth Circuit's decision in *United States v. Cano*—decided approximately a year and a half after Almadaoji arrived at O'Hare—Almadaoji has argued that even if the search of his cellular telephone was routine, it should have been limited in scope to searches for contraband only. In *Cano*, the Ninth Circuit held that routine and non-routine border searches of

---

[13] At issue in *Stewart* was whether the removal of the laptops and duration of the search transformed the search from a border search into an "extended border search" for which reasonable suspicion of criminal activity is required. *Id*. at 524.

17

cellular telephones must be restricted to searches for "digital contraband" and cannot extend to searches for evidence that would aid in prosecuting past, and preventing future, border-related crimes. 934 F.3d at 1018.

As Almadaoji recognizes, other federal circuits disagree with this recent Ninth Circuit holding.  In *United States v. Kolsuz*, the Fourth Circuit approved a forensic search of the defendant's cellphone where the officers sought evidence of the defendant's attempts to export firearms illegally and without a license—a "transnational offense that goes to the heart of the border search exception."  890 F.3d at 143.  The court held that because the government's search of the phone was "conducted at least in part to uncover information about an ongoing transnational crime" the search "fit within the core of the rationale underlying the border search exception." *Id*. (quotations omitted).

In *Alasaad v. Mayorkas*, 988 F.3d at 2-13, the plaintiffs brought an action asserting that basic searches of electronic devices at the border without reasonable suspicion violated the Fourth and First Amendments.  The plaintiffs also argued, consistent with *Cano*, that the border search exception sanctions only searches for contraband itself, and not searches for evidence of border-related crimes or contraband.  *Id*. at 19.  The First Circuit rejected all of plaintiffs' arguments, concluding that "a search for evidence of either contraband or a cross-border crime furthers the purposes of the border search exception to the warrant requirement." *Id*. at 19.  The court characterized the Ninth Circuit's decision in *Cano* as "fail[ing] to appreciate the full range of justifications for the border search exception beyond the prevention of contraband itself entering the country." *Id*. at 21.

For the reasons stated in *Kolsuz* and *Alasaad*, this Court should decline to adopt the reasoning of *Cano*.  As the First and Fourth Circuits have concluded, the justification for the

18

border search exception goes beyond simply interdicting contraband and extends to the detection and prevention of transnational crimes. While the Sixth Circuit has yet to explicitly weigh in on this issue, one decision indicates that it would follow the reasoning in *Kolsuz* and *Alasaad*, and reject *Cano*'s narrow interpretation of the border search exception. In *United States v. Boumelhem*, 339 F.3d 414 (6th Cir. 2003), the Sixth Circuit held that the border search exception applies to exit searches. In so doing, the court noted that exit searches implicate significant government interests in not only controlling exports, but also in national security. *Id*. at 423. The court went on to reject the defendant's contention that the exit search was tainted due to the joint participation of the FBI in the search, noting that Customs was pursuing its own "law enforcement objectives," that Customs agents "discovered every piece of evidence," and that Customs "had its own interests in the suspected export of weapons as a possible violation of laws that it is charged with enforcing." *Id*. at 424.

In these statements, the Sixth Circuit recognized two important points that are in line with the reasoning of *Kolsuz* and *Alasaad*. First, it recognized that the rationale for border searches not only lies in controlling exports and imports, but also in protecting national security. The detection and prevention of transnational crimes—like providing material support to a foreign terrorist organization—unquestionably is a national security interest. Second, the court, at least implicitly, recognized that the scope of a border search may extend beyond contraband to "evidence" of possible "violations" of border-related crimes. Buttressing this analysis is the fact that the Fourth Circuit, in *Kolsuz*, cited *Boumelhem* in support of its conclusion that border searches could properly be employed to search for evidence of transnational crimes, not just contraband. *See* 890 F.3d at 143.

19

Here, the information that CBP obtained from Almadaoji's phone, as limited as it was, could serve as evidence of a transnational crime—namely, providing material support to a foreign terrorist organization.  It is well-established that a person can provide such material support by traveling to a foreign country, joining a foreign terrorist organization, receiving training, and returning to the United States to commit acts on behalf of that foreign terrorist organization.  Almadaoji arrived at O'Hare from an eight-day trip to Egypt and Jordan.  During the interview, he claimed that he had no travel plans, traveled alone, and paid cash for everything.  He made several political statements about the United States, mentioned ISIS, and expressed a view regarding Shiite Muslims consistent with ISIS ideology.  Almadaoji also had shemagh-style head wraps in his bag and told Officer Tripoli that he liked the way they looked on "fighters."

Officer Tripoli conducted the manual search of Almadaoji's phone in conjunction with hearing Almadaoji's statements and observing the items in his luggage.  In recording in writing that Almadaoji had certain applications on his phone and very few photographs of his trip, Officer Tripoli properly gathered evidence of a potentially ongoing transnational crime.  It is common knowledge that foreign terrorist organizations use messaging applications to communicate.  Indeed, as the evidence will show at the trial of this matter, Almadaoji used the messaging application Telegram to communicate with others that he thought were members of ISIS.  The mere presence of messaging applications on Almadaoji's phone could serve as evidence of his involvement with a foreign terrorist organization.  Further, the absence of any photographs from an eight-day trip could constitute evidence of an intent to hide the true nature of the travel.  Officer Tripoli therefore properly recorded in writing potential evidence of an ongoing transnational crime that he observed from the phone.

In summary, the Ninth Circuit's *Cano* decision limiting the scope of border searches to searches for contraband has been rejected by two other circuit courts and appears inconsistent with views expressed in binding Sixth Circuit precedent. Based on that precedent, CBP lawfully recorded in writing information observed from Almadaoji's cellular telephone during the lawfully conducted manual search.

### III. The Good Faith Doctrine Bars the Suppression of Any Evidence or Derivative Evidence Obtained as a Result of the Manual Search.

Even if the United States intended to use evidence obtained from the manual search of Almadaoji's cellular telephone, or derived additional evidence from that search that it intends to use at trial, the good faith doctrine would bar the suppression of any such evidence on the basis of the arguments in Almadaoji's supplemental motion.

In *Davis v. United States*, 564 U.S. 229, 241 (2011), the Supreme Court held that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." This holding was based on the principle that "the harsh sanction of exclusion 'should not be applied to deter objectively reasonable law enforcement activity.'" *Id.* (citing *United States v. Leon*, 468 U.S. 897, 919 (1984)); *see also United States v. Fisher*, 745 F.3d 200, 203 (6th Cir. 2014).

Here, CBP's actions were objectively reasonable based on existing border search authority. At the time of the border search of Almadaoji's phone in 2018, binding precedent in the Seventh Circuit—the location of Chicago O'Hare—and Supreme Court held that "[r]outine searches without a warrant at this country's international borders are per se reasonable." *United States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002); *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). Moreover, "the Supreme Court required no particularized suspicion for a non-destructive border search of property." *United States v. Wanjiku*, 919 F.3d 472, 485 (7th

Cir. 2019).  And no court had held, as *Cano* did a year and a half after the search of Almadaoji's

phone, that manual searches of cellular telephones at the border were limited in scope to searches

for contraband.  Moreover, *Cano*'s holding has been rejected by at least two other federal courts

of appeals.

Given the state of the law at the time of the search, CBP had an objectively good-faith

belief that its conduct here was lawful.  The exclusionary rule serves to deter deliberate, reckless,

or grossly negligent conduct.  *Herring v. United States*, 555 U.S. 135, 144 (2009).  For the

reasons stated above, such circumstances are far from present in this case.  The good faith

doctrine accordingly bars the suppression of any evidence or evidence derived from the search of

Almadaoji's phone on February 24, 2018.

### CONCLUSION

For the foregoing reasons, Almadaoji's supplemental motion to suppress should be

denied.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney

s/ Dominick S. Gerace
DOMINICK S. GERACE (OH 0082823)
NICHOLAS DINGELDEIN (NY 5284674)
Assistant United States Attorneys
200 West Second Street, Suite 600
Dayton, Ohio 45402
Office: (937) 225-2910
Fax: (937) 225-2564
dominick.s.gerace@usdoj.gov
nicholas.dingeldein@usdoj.gov

s/Justin Sher
JUSTIN SHER (DC 974235)
Trial Attorney
National Security Division

22

United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20004
Office: (202) 353-3909
justin.sher@usdoj.gov

**CERTIFICATE OF SERVICE**

This is to certify that on this 6th day of October, 2021, I filed the foregoing using the

Court's ECF system, which will send electronic notification of such filing to all counsel of record.

s/ Dominick S. Gerace
DOMINICK S. GERACE (OH 0082823)
Assistant United States Attorney

23